RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0110p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOHN SCHICKEL, in his Personal and Official Capacities; DAVID WATSON,

>    *Plaintiffs-Appellees/Cross-Appellants*,

KEN MOELLMAN, JR.,

>    *Plaintiff-Appellee*,

Nos. 17-6456/6505

*v.*

CRAIG C. DILGER, in his Official Capacity as Chair and Member, Kentucky Registry of Election Finance; ROSEMARY F. CENTER; TERRY NAYDAN; REID HAIRE; ROBERT D. MATTINGLEY; CHASTITY ROSS; THOMAS B. STEPHENS; JOHN R. STEFFEN,

>    *Defendants-Appellees*,

GEORGE C. TROUTMAN, in his Official Capacity as Chairman and Member of the Kentucky Legislative Ethics Commission; ELMER GEORGE; PAT FREIBART; TONY GOETZ; KEN WINTERS; TOM JENSEN; SHELDON BAUGH; PHIL HUDDLESTON; ANTHONY M. WILHOIT; H. JOHN SCHAFF,

>    *Defendants-Appellants/Cross-Appellees*.

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:15-cv-00155—William O. Bertelsman, District Judge.

Argued: October 18, 2018

Decided and Filed: May 30, 2019

Before: MERRITT, COOK, and LARSEN, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Andrew G. Beshear, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellants/Cross-Appellees. Christopher D. Wiest, CHRIS WIEST, ATTORNEY AT LAW, LLC, Cincinnati, Ohio, for Appellees/Cross-Appellants. Emily Dennis, KENTUCKY REGISTRY OF ELECTION FINANCE, Frankfort, Kentucky, for Appellees. **ON BRIEF:** Matt James, La Tasha Buckner, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellants/Cross-Appellees. Thomas B. Bruns, BRUNS, CONNELL, VOLLMAR & ARMSTRONG, LLC, Cincinnati, Ohio, Robert A. Winter, Jr., FORT MITCHELL, KENTUCKY, for Appellees/Cross-Appellants. Emily Dennis, KENTUCKY REGISTRY OF ELECTION FINANCE, Frankfort, Kentucky, for Appellees. Barbara B. Edelman, Haley Trogdlen McCauley, DINSMORE & SHOHL LLP, Lexington, Kentucky, Tara Malloy, CAMPAIGN LEGAL CENTER, Washington, D.C., for Amici Curiae.

———————————

**OPINION**

———————————

COOK, Circuit Judge. One sitting state senator and one prospective candidate for elected office in Kentucky challenged several state campaign finance and ethics laws, claiming violations of their First Amendment rights to free speech and association and Fourteenth Amendment right to equal protection. Kentucky argues that these measures, enacted to prevent corruption and protect its citizens' trust in their elected officials, comport with the Constitution. The district court, for the most part, disagreed with the Commonwealth. We see it differently.

## I. BACKGROUND

John Schickel, the incumbent state senator for the 11th Senatorial District in Kentucky, and David Watson, who unsuccessfully ran for the 6th House District in 2016, brought this suit alleging that several of Kentucky's campaign finance and ethics statutes violated their rights protected by the First and Fourteenth Amendments. They sued several members of Kentucky's Registry of Election Finance (KREF) and Legislative Ethics Commission (KLEC), agencies charged with enforcing the campaign finance and ethics laws.

This appeal challenges the now defunct campaign finance provision that restricted the amount a candidate may loan to his campaign. Ky. Rev. Stat. Ann. § 121.150(13). As for the

ethics provisions, the legislators challenge seven of them.  Of the seven, three groups of two mirroring provisions—one proscribing certain conduct by legislators and the corollary version for lobbyists—impose:

> (1) **a contribution ban**, §§ 6.767(2) and 6.811(6), which prohibits a legislator, candidate for the legislature, or his or her campaign committee from accepting a campaign contribution from a lobbyist, and a lobbyist from making the same;
>
> (2) **a regular session contribution ban**, §§ 6.767(3) and 6.811(7), which prohibits a legislator, candidate for the legislature, or his or her campaign committee from accepting a campaign contribution from an employer of a lobbyist or a political committee (PAC) during a regular session of the General Assembly, and an employer of a lobbyist from making the same; and
>
> (3) **a gift ban**, §§ 6.751(2) and 6.811(4), which prohibits a legislator or his spouse from accepting "anything of value" from a lobbyist or his employer, and a lobbyist or employer of a lobbyist from knowingly offering the same to a legislator, candidate, or his family.

The final ethics provision applies only to lobbyists:

> (4) **a solicitation/treasurer ban**, § 6.811(5), which prohibits a lobbyist from (i) serving as a campaign treasurer, and (ii) directly soliciting, controlling, or delivering a campaign contribution to a legislator or candidate.

The district court dismissed the campaign finance claim as moot because a legislative amendment eliminated the provision.  As for the ethics provisions, the court found that the laws burdened "core political speech" and curtailed freedom of association, requiring strict scrutiny of every ethics provision except the regular session contribution ban.  It ultimately upheld the regular session contribution ban, but found all the other challenged ethics provisions unconstitutional and unenforceable.

Defendants then moved this court for a stay pending appeal, which we granted.  The parties cross-appealed.

## II. CAMPAIGN FINANCE PROVISION

We begin with the self-funding restriction, repealed in 2017 by the Kentucky legislature, which limited the amount a candidate could personally loan his own campaign.  *See* § 121.150(13) (repealed 2017).  Though this court found the provision wholly unconstitutional in

*Anderson v. Spear*, 356 F.3d 651, 673 (6th Cir. 2004), Schickel and Watson nevertheless worry that KREF may yet enforce the statute.

To establish standing under Article III, a plaintiff must show, among other things, an "injury in fact." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In a pre-enforcement challenge, such as here, a plaintiff satisfies the injury-in-fact requirement by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). "A threat of future enforcement may be 'credible' when the same conduct has drawn enforcement actions or threats of enforcement in the past." *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014).

Here, the legislators have not shown a credible threat of prosecution. KREF has not enforced this provision since *Anderson* struck it down. Indeed, "if a statute is unconstitutional on its face, the State may not enforce the statute under any circumstances." *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 193 (6th Cir. 1997). The legislators cite several alleged enforcements, but all involve other provisions—§§ 121.180 and 121.150(1), (6), (12), and (20)—not this one. *Cf. Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1049 (6th Cir. 2015) (history of past enforcement against others established injury in fact). Nor have the legislators shown that KREF has any intention to enforce this provision. At its 30(b)(6) deposition, in its motion for summary judgment, and during oral argument before this panel, KREF explicitly disavowed enforcement against the legislators for any violations of this provision. The legislators' case does not resemble those it cites to support its position.

Thus, because there exists no credible threat of prosecution, the legislators lack standing to challenge this provision. We affirm the district court's dismissal of the claim on standing grounds.

### III. LOBBYING RESTRICTIONS

Before addressing the merits, we consider whether the legislators have standing to assert challenges to the four ethics provisions governing only the conduct of lobbyists. If the

legislators cannot establish constitutional standing, "their claims must be dismissed for lack of subject matter jurisdiction." *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007). Plaintiffs bear the burden of establishing standing, and they must support each element "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at successive stages of the litigation." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014) (quoting *Lujan*, 504 U.S. at 561). The legislators may not rely on mere allegations, but "must set forth by affidavit or other evidence specific facts" to show standing. *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (quoting *Lujan*, 504 U.S. at 561).

"[T]he nature and extent of facts that must be averred . . . to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue." *Lujan*, 504 U.S. at 561. When he is, "there is ordinarily little question" that the plaintiff has standing. *Id.* at 561–62. But when he is not—when his "asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*"—we require much more. *Id.* at 562. In such circumstances, "causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction." *Id.*; *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (noting that plaintiff's ability to satisfy the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict"). The burden therefore falls on the plaintiff to present facts showing that the third party's "choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562. This does not preclude a showing of standing, but it ordinarily makes it "'substantially more difficult' to establish." *Id.* (citation omitted); *see Warth v. Seldin*, 422 U.S. 490, 504 (1975).

The legislators face an uphill climb: they are not the object of the lobbying restrictions. But the legislators can establish standing from the *operation* of these lobbying restrictions; that is, by showing that a restriction has been applied to a lobbyist, his employer, or a PAC—or imminently will be—and "ha[s] caused or will imminently cause" plaintiffs' concrete injury. *See Tenn. Republican Party v. Sec. & Exch. Comm'n*, 863 F.3d 507, 520 (6th Cir. 2017). Here, the

legislators claim the operation of these statutes infringe their right to associate, "receive information," and "receive[] contributions." An individual's right to associate, "broadly defined" by the Supreme Court, includes "the ancillary right of the candidate to 'amas[s] the resources necessary for effective advocacy.'" *Frank v. City of Akron*, 290 F.3d 813, 818 (6th Cir. 2002) (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 396–97 (2000)). Thus, the legislators could also prove injury by showing that the challenged laws "w[ere] so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." *Shrink*, 528 U.S. at 397.

Affidavits from Schickel and Watson do not establish an injury from the operation of the contribution ban or regular session contribution ban. Even assuming a right to receive contributions, *compare Dean v. Blumenthal*, 577 F.3d 60, 69 (2d Cir. 2009) ("[A]lthough *Randall* did not recognize a First Amendment right to receive campaign contributions, its analysis did not foreclose such recognition."), *with Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 894 (9th Cir. 2018) ("But while the First Amendment protects the right of an individual to express herself through the medium of finance, it does not establish a free-floating right to receive the funds necessary to broadcast one's speech."), the legislators have not shown these restrictions have caused or imminently will cause them injury.

Because they have not done so, "by affidavit or other evidence," they lack standing to challenge these lobbying restrictions. *See McKay*, 823 F.3d at 867. The legislators offer no affidavit from a lobbyist or his employer regarding these restrictions, and they fail to provide evidence that a specific lobbyist, his employer, or a PAC attempted to help in ways proscribed by the provisions—e.g., serve as treasurer, solicit contributions, or make a contribution—but was turned away due to the lobbying restrictions. The lack of such evidence dooms their claims. *See Tenn. Republican Party*, 863 F.3d at 517 ("[T]here is no reason why Petitioners could not have put forth an affidavit from a particular municipal advisor professional who would have contributed more than $250 were it not for the 2016 Amendments."); *Lavin v. Husted*, 689 F.3d 543, 545–47 (6th Cir. 2012) (holding that Medicaid providers had standing to challenge a law that did not punish them because they had "attempted to contribute" to a state Attorney General candidate who "refused to accept their contributions, citing Ohio law").

Instead, Schickel and Watson offer their own affidavits, stating their belief that *others* would like to violate the restrictions. Schickel asserted that, if not for the contribution restrictions, he "would accept campaign donations[] from employers of lobbyists" and "from certain registered lobbyists . . . whose values I share." R. 65-2, Schickel Aff. ¶¶ 26, 27. Mirroring Schickel's affidavit, Watson averred that "I would, if not prohibited, accept donations from [two organizations], and would also accept, if not prohibited, donations on behalf of the lobbyists that lobby for them." R. 65-3, Watson Aff. ¶ 37. But the assurance that both would accept such contributions means nothing in the absence of an affidavit or other evidence establishing that such contributions were attempted or would be in the imminent future. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Lujan*, 504 U.S. at 564 n.2) ("[I]mminence is concededly a somewhat elastic concept, [but] it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending.").

As for the provision that bans gifts by lobbyists, the legislators' statements fall short. Both attested that, before this law's enactment, they "would not hesitate to take a meeting at a lobbyist's office." R. 65-2, Schickel Aff. ¶ 29; R. 65-3, Watson Aff. ¶ 39. After the 2014 amendment removed the de minimis exception, however, both fear doing so, since "sitting in an air conditioned office" or "receiving a piece of paper to take notes" could be considered "something of value." R. 65-2, Schickel Aff. ¶ 29; R. 65-3, Watson Aff. ¶ 39. But the legislators cannot manufacture standing by "inflicting harm on themselves based on their fear of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. According to Schickel, he "used to take turns buying the soda or cup of coffee" with constituents and lobbyists but now does so with only constituents "given the rules in place," R. 65-2, Schickel Aff. ¶ 28, but this alleged injury hinges entirely "on the unfettered choices made" by lobbyists to purchase coffee for him, *Kadish*, 490 U.S. at 615. This statement offers little more than Schickel's own guess as to *why* legislators have stopped purchasing coffee for him (perhaps they prefer the new status quo), and thus fails to adduce facts sufficient to show that the choice not to buy him coffee can be fairly traced to this provision. *See Lujan*, 504 U.S. at 567 ("Standing is not 'an ingenious academic exercise in the conceivable.'" (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 688 (1973))).

The legislators' affidavits also fall short on the solicitation/treasurer restriction. Each includes just the lone statement referencing an injury: "[I] would like to have a legislative agent serve as my campaign treasurer, and I am aware of legislative agents that would like to solicit others to make campaign donations to me, but cannot under the current legislative ethics scheme." R. 65-2, Schickel Aff. ¶ 33; R. 65-3, Watson Aff. ¶ 42. This is not the proof needed at summary judgment. *Miyazawa v. City of Cincinnati*, 45 F.3d 126, 127 (6th Cir. 1995) (holding at summary judgment stage that plaintiff lacked standing because she "merely asserted a general complaint that an unidentified candidate that she may want to vote for may not be eligible to run for that office").

Last, we turn to the legislators' suggestion that "receiving donations and giving of donations are two sides of the same coin," such that a party who has standing to challenge one has standing to challenge the other. Appellee Br. at 59. But in the one case they cite for this proposition, the political committee and lobbyist acquired standing to challenge the restricting of soliciting by legislators based on showing that the provision injured *them* rather than the legislators or candidates. *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999).

In the absence of specific evidence supporting standing to challenge the lobbying restrictions, the legislators may not.

## IV. ETHICS PROVISIONS

We now examine the legislators' challenges to the constitutionality of the three ethics provisions that target their own conduct: the contribution ban, regular session contribution ban, and gift ban.

### A. Standard of Review

We review de novo a district court's judgments under Federal Rule of Civil Procedure 56. *Allied Constr. Indus. v. City of Cincinnati*, 879 F.3d 215, 219 (6th Cir. 2018). Summary judgment may be entered only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, the parties filed cross-motions for summary judgment, "the court must evaluate each party's motion

on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *McKay*, 823 F.3d at 866 (citation omitted).

## B. Level of Scrutiny Applied

The legislators argue that limiting their receiving contributions burdens political speech. But contribution limits entail "only a marginal restriction upon the contributor's ability to engage in free communication," as they permit "the symbolic expression of support evidenced by a contribution but do[] not in any way infringe the contributor's freedom to discuss candidates and issues." *Buckley v. Valeo*, 424 U.S. 1, 20–21 (1976) (per curiam). As such, they are subject to closely drawn scrutiny, a "lesser but still 'rigorous standard of review.'" *McCutcheon v. FEC*, 572 U.S. 185, 197 (2014) (plurality opinion) (quoting *Buckley*, 424 U.S. at 29). And contribution *bans*—such as those enacted here—receive the same treatment. *FEC v. Beaumont*, 539 U.S. 146, 161–62 (2003) (expressly declining to apply strict scrutiny to a contribution ban).

The same goes for the gift ban. *See Preston v. Leake*, 660 F.3d 726, 729–30 (4th Cir. 2011) (upholding lobbyist contribution ban, which defined contributions to include gifts, under closely drawn scrutiny). Restrictions on gift giving, like those on contributions, are marginal restrictions that do not in any way hinder lobbyists' or legislators' ability to discuss candidates or issues. *Buckley*, 424 U.S. at 20–21. Indeed, if contribution restrictions "lie closer to the edges than to the core of political expression," *Beaumont*, 539 U.S. at 161, gifts of value hug the fringe. *See United States v. Ring*, 706 F.3d 460, 466 (D.C. Cir. 2013) ("[T]he First Amendment interest in giving hockey tickets to public officials is, at least compared to the interest in contributing to political campaigns, de minimis.").

## C. Applying Closely Drawn Scrutiny

Closely drawn scrutiny requires the Commonwealth to demonstrate that each provision furthers "a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *McCutcheon*, 572 U.S. at 197 (quoting *Buckley*, 424 U.S. at 25); *see Lavin*, 689 F.3d at 547.

**1. Do the challenged provisions further a "sufficiently important" government interest?**

The Commonwealth asserts a familiar interest for the ethics provisions: the prevention of actual quid pro quo corruption or its appearance. *See* § 6.606. This interest has long been considered sufficiently important to justify regulating campaign contributions, and "may properly be labeled 'compelling,' so that [it] would satisfy even strict scrutiny." *McCutcheon*, 572 U.S. at 199 (quoting *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496–97 (1985)). It follows that this focus on preventing corruption or its appearance would also justify Kentucky's gift ban. *See Fla. Ass'n of Prof'l Lobbyists, Inc. v. Div. of Legislative Info. Servs. of the Fla. Office of Legislative Servs.*, 525 F.3d 1073, 1080–81 (11th Cir. 2008) (upholding lobbyist gift ban); *Preston*, 660 F.3d at 729. But having an undeniably important interest is not enough; Kentucky must still "demonstrate *how* its [ethics provisions] further[]" that interest. *Lavin*, 689 F.3d at 547.

To do so, Kentucky must show only "a cognizable *risk* of corruption"—a "*risk* of quid pro quo corruption or its appearance." *McCutcheon*, 572 U.S. at 210 (emphasis added); *see Citizens United v. FEC*, 558 U.S. 310, 357 (2010) (noting that "restrictions on direct contributions are *preventative*" and that the *Buckley* Court "sustained limits on direct contributions in order to *ensure against* the reality or appearance of corruption") (emphases added). The threat of corruption must be more than "mere conjecture," *Shrink*, 528 U.S. at 392, and cannot be "illusory," *Buckley*, 424 U.S. at 27. But a state need not produce evidence of actual instances of corruption. *See McConnell v. FEC*, 540 U.S. 93, 150 (2003), *overruled in part on other grounds by Citizens United*, 558 U.S. at 365–66; *Lair v. Motl*, 873 F.3d 1170, 1178 (9th Cir. 2017); *Ognibene v. Parkes*, 671 F.3d 174, 183 (2d Cir. 2011) ("It is not necessary to produce evidence of actual corruption to demonstrate the sufficiently important interest in preventing the appearance of corruption."). Ultimately, "[t]he quantum of empirical evidence needed . . . will vary up or down with the novelty and plausibility of the justification raised." *Shrink*, 528 U.S. at 391.

The Commonwealth's briefs describe a sordid history. In the wake of an infamous FBI investigation into public corruption in Kentucky that led to "the indictment and conviction of legislators, former legislators, and lobbyists for criminal misconduct," known as Operation

BOPTROT, the state legislature enacted the Ethics Code. *Assoc. Indus. of Ky. v. Commonwealth*, 912 S.W.2d 947, 950 (Ky. 1995). In the aftermath of BOPTROT, the public lost faith in its elected officials, and public standing plunged to an all-time low. Tom Loftus & Al Cross, *Lies, Bribes and Videotape*, The Courier-Journal, July 1, 1993. Corruption was rampant and came cheap—in some cases, legislators accepted as little as $400 from lobbyists in exchange for influencing legislation. *Id.*; Martin Booe, *Ethics: Kentuckians Amazed that $400 Can Buy a Lawmaker*, L.A. Times, April 13, 1993.

Kentucky's stated interest "[is] neither novel nor implausible." *Shrink*, 528 U.S. at 391. The contribution ban—enacted against this backdrop and untouched by the 2014 amendments—plainly furthers Kentucky's anticorruption interest. Its own supreme court agreed, rejecting several constitutional challenges to the Code's provisions by an employer of lobbyists and holding that the state demonstrated "a compelling interest in insuring the proper operation of a democratic government and deterring corruption, as well as the appearance of corruption." *Assoc. Indus.*, 912 S.W.2d at 953; *see* § 6.606.

The legislators argue that Operation BOPTROT involved only the horse racing industry, and therefore cannot serve as the basis for restrictions on all lobbyists. Given that lobbyists were caught up in BOPTROT, however, we find this argument specious. A state need not wait for the entanglement of every industry or every lobbyist in scandal before taking action. *See Ognibene*, 671 F.3d at 188; *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 210 (1982) ("Nor will we second guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared.").

Kentucky also demonstrated how the regular session contribution ban, created by the 2014 amendments, furthers this anticorruption interest. The risk of corruption stemming from contributions by employers of lobbyists or PACs *during* a regular session of the legislature "is common sense and far from illusory." *Ognibene*, 671 F.3d at 187; *Bartlett*, 168 F.3d at 715–16 (upholding prohibition on in-session lobbyist and PAC contributions); *Kimbell v. Hooper*, 665 A.2d 44, 51 (Vt. 1995) (upholding in-session contribution ban and noting that the measure "avoid[ed] a serious appearance of impropriety"). The regular session runs, at most, from early January to March 30th (in odd-numbered years) or April 15th (in even-numbered years).

Ky. Const. §§ 36, 42. Stifling direct contributions from two of the most powerful players in the political arena during these three or so months undoubtedly furthers Kentucky's interest in preventing the appearance of corruption. *See N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 291 (4th Cir. 2008) ("Direct contributions to political candidates run the greatest risk of making candidates 'too compliant with the wishes of large' donors." (quoting *Shrink*, 528 U.S. at 389)).

In the years since the Code's enactment, history confirms that contributions from lobbyists, their employers, and PACs, as well as gifts from lobbyists, suggest quid pro quo corruption or its appearance. *Ky. Right to Life, Inc. v. Terry*, 108 F.3d 637, 639 (6th Cir. 1997) ("Numerous Kentucky public officials have been convicted of abusing their political offices for personal gain over the past twenty-five years."); *Preston*, 660 F.3d at 737 ("We also conclude that in aiming the ban at only lobbyists, who, experience has taught, are especially susceptible to political corruption, North Carolina closely drew its enactment to serve the state interests it identified."); *Bartlett*, 168 F.3d at 716 ("The appearance of corruption resulting from PAC and lobbyist contributions during the legislative session can also be corrosive.").

Further, if lobbyists' employers and PACs were "free to contribute to legislators while pet projects sit before them, the temptation to exchange 'dollars for political favors' [would] be powerful." *Bartlett*, 168 F.3d at 716 (citation omitted). Even though PACs and lobbyists' employers may "have no intention of directly 'purchasing' favorable treatment, appearances may be otherwise." *Id.* Where "the conflict of interest is apparent [and] the likelihood of stealth great," *Blount v. SEC*, 61 F.3d 938, 945 (D.C. Cir. 1995), we will not require Kentucky to "experience the very problem it fears before taking appropriate prophylactic measures," *Ognibene*, 671 F.3d at 188.

As for the removal of the de minimis exception from the gift ban, we note that the Commonwealth enacted this exception at the same time as the contribution limit—in the immediate aftermath of the BOPTROT scandal. Removing the exception simply changed the limit on gifts from $100 to $0. Kentucky's choice to reduce the limit to $0, we think, "goes to whether the limit is sufficiently tailored, not whether [Kentucky] had a sufficiently important interest to justify setting any [gift] limit at all." *Zimmerman v. City of Austin*, 881 F.3d 378, 386

(5th Cir. 2018). But even if we required a showing that its decision to remove this exception furthers its anticorruption interest, Kentucky has done so.

As KLEC's representative explained, removing the de minimis exception—and the administrative blunders that accompanied it—helps prevent the appearance of corruption. To be sure, KLEC's representative admitted that the de minimis exception "had not developed into an ethics problem," but that it was an "administrative" and "public perception" problem. R. 47-1, PageID 881–82. Administering the exception led to "incorrect reports that include[d] legislators who didn't even attend events or didn't eat or drink at the events but they're getting their name publicized." *Id.* at PageID 883. Faced with this issue, the legislature decided to entirely close this "loophole in the law" by "paint[ing] a brighter line for the General Assembly and the public to know that legislators are not taking anything of value." *Id.* at PageID 826–27.

Kentucky is not an outlier. Both before the district court and on appeal, Kentucky cited the laws and experiences of other states to justify the removal of the de minimis exception. *See Wagner v. FEC*, 793 F.3d 1, 14 (D.C. Cir. 2015) (en banc) (noting the relevance of the "experience of states with and without similar laws" to this inquiry). The Commonwealth took this action after KLEC recommended it, grounding the recommendation on its research of governmental ethics issues, a task assigned to it by statute. *See* § 6.666(15). Its research yielded plentiful and detailed newspaper accounts from across the country "supporting inferences of impropriety" arising from gifts of value, *Shrink*, 528 U.S. at 393, including several that discussed how lobbyists and their employers skirted de minimis exceptions with tickets to sporting events, rounds of golf, and cigars. R. 64-5, PageID 3361. In addition to its recommendation, KLEC compiled these news articles into Ethics Reporters, which it disseminated monthly to all legislators, lobbyists, and employers of lobbyists. R. 64-5, PageID 3354–67.[1]

---

[1]The legislators cross-appeal the district court's denial of their motion to strike these newsletters, arguing that the clips of several newspaper articles within them constitutes "inadmissible hearsay and was unauthenticated." But because the newsletters were authenticated, *see* R. 82, PageID 4163–64, and plainly not offered for the truth of the matter asserted, they are not hearsay. *See Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009). Rather, they were offered as evidence of what was before the legislature at the time, and for their effect on KLEC's recommendation to the legislature.

And just as in *Wagner*, further evidence comes from other states enacting their own gift bans that do not have de minimis exceptions. *See, e.g.*, Fla. Stat. Ann. § 112.313(2); Haw. Rev. Stat. Ann. § 84-11; Minn. Stat. Ann. § 10A.071(2); S.C. Code Ann. § 2-17-80(A); Vt. Stat. Ann. tit. 2, §§ 261(6)(a), 266(a)(2); Wisc. Stat. Ann. §§ 19.42, 19.45, 19.56(3). "The fact that many states have such laws shows that [Kentucky] is no outlier," *Wagner*, 793 F.3d at 16, and that other states believe gifts of value create a threat of corruption or its appearance.

\* \* \*

Tellingly, perhaps, of the 138 members of the Kentucky General Assembly, only one member—the member who initiated this lawsuit—voted against the 2014 amendments that enacted the regular session ban and removed the de minimis exception. Kentucky Legislature, 2014 Regular Session Voting Record – HB 28, https://apps.legislature.ky.gov/record/14rs/hb28.html. Just as the overwhelming seventy-four-percent statewide vote in favor of the contribution limits in *Shrink* helped demonstrate the state's interest, 528 U.S. at 394, so too this landslide vote. Had the legislators made a showing of their own to cast doubt on the evidence presented here, Kentucky might have needed to show more. *Id.* But on this record, Kentucky adequately illustrated that these ethics provisions further the sufficiently important interest of preventing quid pro quo corruption or its appearance.

**2. Are the challenged provisions closely drawn?**

To clear the second hurdle of the closely drawn test, a state must show it employed "means closely drawn to avoid unnecessary abridgment of associational freedoms." *McCutcheon*, 572 U.S. at 197 (quoting *Buckley*, 424 U.S. at 25). This requires "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' . . . that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective." *Id.* at 218 (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)). In conducting such review, of course, we owe "proper deference to a [legislative] determination of the need for a prophylactic rule [to address] the evil of potential corruption." *Nat'l Conservative Political Action Comm.*, 470 U.S. at 500; *Nat'l Right to Work Comm.*, 459 U.S. at 210.

*Contribution Ban.* This provision prohibits a legislator from accepting a campaign contribution from a lobbyist. § 6.767(2). Not long ago, the Fourth Circuit applied closely drawn scrutiny and upheld a complete ban on campaign contributions by lobbyists. *Preston*, 660 F.3d at 729, 735–36. There, plaintiff argued that the provision was not closely drawn because the state "could have allowed for . . . small donations . . . without undermining its interest in preventing actual and perceived corruption." *Id.* at 736. The court rejected this argument, reasoning that, in response to recent scandals, the legislature made the "rational judgment that a complete ban was necessary as a prophylactic to prevent not only actual corruption but also [its] appearance." *Id.* The court also emphasized that the ban aimed only at lobbyists "who, experience has taught, are especially susceptible to political corruption." *Id.* at 737. "This is both an important and a legitimate legislative judgment that '[c]ourts simply are not in the position to second-guess,' especially 'where corruption is the evil feared.'" *Id.* at 736 (citation omitted).

The Fourth Circuit's reasoning persuades us. Lobbyists' role undoubtedly sharpens the risk of corruption and its appearance. *See Wagner*, 793 F.3d at 22; *see* Eric Lipton & Ben Protess, *Banks' Lobbyists Help in Drafting Financial Bills*, N.Y. Times, May 23, 2013. To be sure, "[t]he role of a lobbyist is both legitimate and important to legislation and government decisionmaking, but by its very nature, it is prone to corruption and therefore especially susceptible to public suspicion of corruption." *Preston*, 660 F.3d at 737. Indeed, contributions and gifts from lobbyists and others who have a "particularly direct financial interest in these officials' policy decisions pose a heightened risk of actual and apparent corruption, and merit heightened government regulation." *Ognibene*, 671 F.3d at 188; *see Preston*, 660 F.3d at 737 ("*Any payment* made by a lobbyist to a public official, whether a campaign contribution or simply a gift, calls into question the propriety of the relationship, and therefore North Carolina could rationally adjudge that it should ban *all* payments.").

We find no merit to the legislators' argument that only *recent* scandals justify a contribution ban. Courts do not require a recent scandal; indeed, the Supreme Court views contribution limits as *preventative* measures. *Citizens United*, 558 U.S. at 356 (noting the preventative nature of direct contribution restrictions because "the scope of such pernicious

practices can never be reliably ascertained"). We do not require Kentucky "to experience the very problem it fears before taking appropriate prophylactic measures." *Ognibene*, 671 F.3d at 188.

Yes, a total ban presents a significant restriction. But under the closely drawn standard, "[e]ven a 'significant interference with protected rights' of political association may be sustained." *McCutcheon*, 572 U.S. at 197 (citation and internal quotation marks omitted). While this ban dispenses with one means a legislator has to gather funds, it leaves open others less susceptible to the same risk of corruption or its appearance, and thus survives closely drawn scrutiny. *See Preston*, 660 F.3d at 734 (finding that the ban "serv[ed] only as a channeling device, cutting off the avenue of association and expression that is most likely to lead to corruption but allowing numerous other avenues of association and expression").

*Regular Session Contribution Ban.* This provision broadens the reach of the contribution ban; it prohibits a legislator from accepting campaign contributions from employers of lobbyists and PACs, though only during a regular legislative session. § 6.767(3). The district court upheld the ban, relying primarily on two cases. *See Bartlett*, 168 F.3d at 715–16 (finding a nearly identical ban closely drawn because it applied to only two of the "most ubiquitous and powerful players in the political arena," and did "nothing more than place a temporary hold" on the ability to contribute during the time when the risk of corruption is highest); *Kimbell*, 665 A.2d at 51 (finding a ban on contributions by lobbyists during active legislative sessions closely drawn because it focused on "a narrow period during which legislators could be, or could appear to be, pressured, coerced, or tempted into voting on the basis of cash contributions"). We agree.

First, this time-specific ban restricts less than would an absolute ban, *Lavin*, 689 F.3d at 548, and targets the time when the risk of quid pro quo corruption—especially its appearance—is highest, *Bartlett*, 168 F.3d at 716. Indeed, contributions to a legislator (or his challenger) when a legislator is poised to cast a favorable (or unfavorable) vote on a pet bill could cause Kentuckians to question whether the contribution motivated the vote. *See id.* ("[T]he temptation to exchange 'dollars for political favors' can be powerful."). For that reason, we assess this limited ban as permissible. As the Supreme Court emphasized, "the danger of corruption and the appearance of

corruption apply with equal force to challengers and to incumbents," justifying "imposing the *same* fundraising constraints upon both." *Buckley*, 424 U.S. at 33 (emphasis added).

In addition to the time limitation, the Commonwealth limited the coverage of this ban to two of the "most ubiquitous and powerful players in the political arena." *Bartlett*, 168 F.3d at 716. Though these players can significantly inform the legislative process, "there remain powerful hydraulic pressures at play [that] can cause both legislators and lobbyists to cross the line." *Id.* The legislators take issue with the scope of this ban, arguing that it covers "[e]ach and every PAC," not just those that employ lobbyists, as was the case in *Bartlett*. 168 F.3d at 714. But Kentucky similarly limited the definition of what constitutes a PAC. As we noted over twenty years ago, the Kentucky General Assembly "explicitly narrow[ed] the definition of 'permanent committee' to encompass only those organizations which expressly advocate the election or defeat of clearly identified candidate(s)." *Terry*, 108 F.3d at 643; *see* Ky. Rev. Stat. Ann. § 121.015(3)(d).

The level of scandal uncovered by Operation BOPTROT, as well as the experiences of other states, provides more than "scant evidence" that lobbyists sometimes turn to employers and PACs to achieve their ends. *McConnell*, 540 U.S. at 232, *overruled on other grounds by Citizens United*, 558 U.S. 310. Indeed, if we upheld the absolute ban on lobbyist contributions but struck down this restriction, we would be inviting the very circumvention proscribed by this provision. *See Leake*, 525 F.3d at 292. Because this provision "does nothing more than recognize that lobbyists"—and their employers and narrowly-defined PACs—"are paid to persuade legislators, not to purchase them," *Bartlett*, 168 F.3d at 718, and that contributions made by these power players during an active session are particularly likely to give rise to the appearance of corruption, we find this time-limited ban closely drawn.

*Gift Ban.* The gift ban provision prohibits a legislator or his spouse from soliciting, accepting, or agreeing to accept "anything of value" from a lobbyist or his employer. § 6.751(2). We again see no constitutional problem here. The gift ban does not prevent lobbyists and legislators from meeting to discuss pressing issues facing Kentuckians. To be sure, it does not forbid *any* interaction or the utterance of *any* word between the two. They may associate as often as they wish over a cup of coffee or dinner or baseball game. This law simply requires

that, if they do, legislators pay their own way.  A fair, reasonable way of preventing quid pro quo corruption and its appearance.  Appellant Br. at 31 (noting that legislators receive a $154 per diem from taxpayer funds during the session for precisely this purpose).

In addition, we reject the legislators' argument that permitting events where all legislators are invited and not requiring reporting of who attended such events makes these provisions underinclusive.  *See* § 6.611(2)(b)(8); *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1670 (2015) ("Underinclusivity creates a First Amendment concern when the State regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest *in a comparable way*.").  This exception *permits* associations and facilitates speech between lobbyists and legislators without undercutting Kentucky's stated interest or abridging associational freedoms.  Through this carve out, Kentucky encourages interactions that are less likely to raise concerns about actual or apparent corruption.  R. 47-1, PageID 785 ("[I] think they focused on events to which bipartisan, bicameral groups of legislators were invited . . . , [which are] much less problematic than a one-on-one dinner . . . where a lobbyist pays all the tab and gets that kind of one-on-one time.").  Thus, this provision survives closely drawn review.

Having found these provisions closely drawn, we turn to examine the legislators' other arguments for striking down the gift ban—that it is content based, a violation of their right to equal protection, vague, and overbroad.  As to each, we disagree.

### D. Content-Based Restriction on Speech

The legislators argue that the gift ban provision is a content-based restriction because it "targets gifts based on the identity of the giver."  Appellee Br. at 32.  But speaker-based bans are not automatically content based or content neutral.  Rather, because "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," *Citizens United*, 558 U.S. at 340, such laws "demand strict scrutiny when the legislature's speaker preference reflects a content preference," *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994)); *see Nat'l Inst. of Family*

*& Life Advocates v. Becerra*, 138 S. Ct. 2361, 2378 (2018). To make this determination, we follow the framework set out by the Supreme Court in *Reed*. 135 S. Ct. at 2230.**²**

A law reflects a content preference when it cannot be "justified without reference to the content of the regulated speech" or was "adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* at 2227 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). In making this determination, "[t]he government's purpose is the controlling consideration." *Ward*, 491 U.S. at 791. "[A] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *See McCullen v. Coakley*, 573 U.S. 464, 480 (2014) (quoting *Ward*, 491 U.S. at 791). The gift ban provision passes this test.

Again, Kentucky's purpose was clear: To protect the integrity of the legislative process and avoid the reality or appearance that state legislation was being bought and sold. § 6.606. Such a purpose reflects a preference for a state legislature that maintains the trust of its citizens, not for the expression of certain content. *See McCullen*, 573 U.S. at 480. Nor have the legislators offered any evidence that the provision was adopted by Kentucky "because of disagreement with the message [the speech] conveys." *Reed*, 135 S. Ct. at 2227. It applies to gifts that are "pecuniary or compensatory in value," regardless of whether they convey any message at all.

In *Reed*, the Court discussed speaker-based bans and explained that a law limiting the content of newspapers—and only newspapers—could not avoid strict scrutiny "simply because it could be characterized as speaker based." 135 S. Ct. at 2230. So too, a "content-based law that restricted the political speech of all corporations would not become content neutral just because it singled out corporations as a class of speakers." *Id.* (citing *Citizens United*, 558 U.S. at 340–41). *Reed*, at bottom, teaches us to be wary of speaker-based restrictions that are nothing more than content-based restrictions in disguise. And wary we are. Kentucky's gift ban provision,

---

**²**Normally, the "first step in the content-neutrality analysis" requires us to determine "whether the law is content neutral on its face." *Reed*, 135 S. Ct. at 2228. Nowhere, however, do the legislators argue that this provision is facially content based.

however, serves an anticorruption purpose unrelated to the content of expression and is justified without any reference to the content of the gifts regulated. *See Ward*, 491 U.S. at 791.

Since the gift ban provision is content neutral, it is "subject to an intermediate level of scrutiny." *Turner*, 512 U.S. at 642. Thus, just as the other First Amendment challenges here, we apply closely drawn scrutiny. *See Zimmerman*, 881 F.3d at 384–85 (rejecting argument that base contribution limit was content based and applying closely drawn scrutiny). Again, the Commonwealth has demonstrated that the gift ban advances its anticorruption interest and employs means closely drawn to do so, and therefore survives closely drawn review.

### E. Equal Protection

The district court found that the gift ban violated lobbyists' right to equal protection because "[e]ven though lobbyists and their employers are not part of a suspect class, a law that treats them differently from other citizens is subject to the highest level of scrutiny when it seeks to suppress their political expression." R. 122, PageID 4642. It got there by relying on the Supreme Court's decision in *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652 (1990), where the Court held that "[b]ecause the right to engage in political expression is fundamental to our constitutional system, statutory classifications impinging upon that right must be narrowly tailored to serve a compelling governmental interest." *Id.* at 666, *overruled on other grounds by Citizens United*, 558 U.S. 310.

In *Citizens United*, the Court overruled *Austin* on the question of whether the government may, under the First Amendment, suppress political speech "based on the corporate identity of the speaker." 558 U.S. at 364. But the Court did not express an intent to overturn *Austin*'s holding regarding the level of scrutiny applied to political expression, so it remains good law. *See Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 879–80 (8th Cir. 2012) (en banc) (explaining that *Citizens United* did not explicitly overrule the equal protection analysis in *Austin*); *Riddle v. Hickenlooper*, 742 F.3d 922, 928 n.4 (10th Cir. 2014) (same). That said, several of our sister circuits express doubt as to whether *Austin* demands strict scrutiny in cases involving equal protection challenges to contribution limits.

The D.C. Circuit, sitting en banc, found *Austin* distinguishable and declined to follow it. *Wagner*, 793 F.3d at 32. It held that closely drawn scrutiny applied to an equal protection challenge to a contractor contribution ban, rejecting the "doctrinal gambit" that "would require strict scrutiny notwithstanding the Supreme Court's determination that the 'closely drawn' standard is the appropriate one under the First Amendment." *Id.* It noted that, although the Supreme Court "has on occasion applied strict scrutiny in examining equal protection challenges in cases involving First Amendment rights, it has done so only when a First Amendment analysis would itself have required such scrutiny." *Id.* Such was the case in *Austin*, where the Court applied strict scrutiny to determine whether restrictions on *independent expenditures* by corporations passed muster under the equal protection clause. *Austin*, 494 U.S. at 655–56. To be sure, the plaintiffs in *Wagner* could find "no case in *any* court 'in which an equal-protection challenge to contribution limits succeeded where a First Amendment one did not.'" *Wagner*, 793 F.3d at 32–33 (citation omitted).

In *Riddle*, although the Tenth Circuit applied the closely drawn test to an equal protection challenge to contribution limits that treated candidates differently if they were unopposed for their nominations only "[f]or the sake of argument," the court recognized that, in the First Amendment context, the Supreme Court has applied closely drawn scrutiny to contribution limits. *Riddle*, 742 F.3d at 927–28. In his concurrence, then-Judge Gorsuch noted that "the Court has yet to apply strict scrutiny to contribution limit challenges—employing [closely drawn scrutiny] instead," and questioned whether "an interest [can] become more potent ('more' fundamental) when viewed through the lens of equal protection analysis?" *Id.* at 931 (Gorsuch, J., concurring).

The Second Circuit too summarily rejected an equal protection challenge to a contribution limit where it already had held that the limit did not constitute viewpoint discrimination under the First Amendment. *Ognibene*, 671 F.3d at 193 n.19. And in rejecting the same sort of challenge, one district court stated that it was not surprising such arguments had failed because the Supreme Court's precedent "hold[s] that it makes no difference whether a challenge to the disparate treatment of speakers or speech is framed under the First Amendment or the Equal Protection Clause." *Illinois Liberty PAC v. Madigan*, 902 F. Supp. 2d 1113, 1126

(N.D. Ill. 2012) (collecting Supreme Court cases); *see City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 55 n.4 (1986) ("As should be apparent from our preceding discussion, respondents can fare no better under the Equal Protection Clause than under the First Amendment itself.").

As for this circuit, we've not yet considered the level of scrutiny to apply. From our review of other circuits' precedent, however, we agree that the best reading of *Austin*, especially considering the scope of its application, confines its holding to cases in which the First Amendment analysis itself requires strict scrutiny. *See Wagner*, 793 F.3d at 32. We have found no case where the Supreme Court applied strict scrutiny in examining an equal protection challenge when the First Amendment analysis itself did not require such scrutiny, *see id.*, and just as our sister circuits, we decline to be the first. Thus, we hold that closely drawn scrutiny, the tier of scrutiny applied to the First Amendment challenge, also applies to the equal protection challenge. The gift ban withstands such scrutiny.

## F. Vagueness

To succeed on a vagueness challenge, a plaintiff must show either that the law (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits"; or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2566 (2015). For laws that interfere with the right of free speech or association, "a more stringent vagueness test should apply." *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 894 F.3d 235, 246 (6th Cir. 2018). But we do not require "perfect clarity and precise guidance." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010). On appeal, plaintiffs challenge only "the vague so called 'catchall' provision"—§ 6.611(2)(a)(14), not the entire definition of "anything of value" in § 6.611(2)(a).

*Fair Notice.* When determining whether a law provides fair notice, "in the absence of state court guidance, we examine 'the words of the ordinance itself.'" *Platt*, 894 F.3d at 246 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)). The catch-all provision reads: "[a]ny other thing of value that is pecuniary or compensatory in value to a person, or the primary significance of which is economic gain." § 6.811(2)(a)(14). A common dictionary defines

"value" as "the monetary worth of something," *Webster's Third New International Dictionary Unabridged* 2530 (2002), and "pecuniary" nearly the same, *id.* at 1663.  And "compensatory" is defined as "serving as compensation," with "compensation" defined as "the act or action of making up, making good, or counterbalancing," or "payment for value received or service rendered." *Id.* at 463.

No vagueness plagues any of these terms.  Laws marked by "flexibility and reasonable breadth, rather than meticulous specificity," are not inevitably vague, *see Platt*, 894 F.3d at 246–47, and we do not require—or expect—"mathematical certainty from our language." *Grayned*, 408 U.S. at 110.  A person of ordinary intelligence would know that this language—used in both legal and common parlance—bars them from accepting or soliciting money or a gift that serves as payment for a service provided.  *See Platt*, 894 F.3d at 247.  And the additional phrase "or the primary significance of which is economic gain" does not muddy the waters.

Here, though the catch-all provision is marked by flexibility and reasonable breadth, we think "it is clear what the ordinance as a whole prohibits."  *Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trustees*, 411 F.3d 777, 798 (6th Cir. 2005).  Even if these "words leave some wiggle room," *Platt*, 894 F.3d at 247, the Ethics Code provides multiple mechanisms to determine whether the gift is permissible.  *See* § 6.827(1) (requiring lobbyists and their employers to deliver a copy of reported expenditures to the legislator at least ten days before filing a report with KLEC); *see* § 6.827(2) (providing procedure for resolving any discrepancies in report).  Most importantly, § 6.681 allows a legislator or lobbyist to seek an advisory opinion to clarify any ambiguities, admittedly not done here.  *See Platt*, 894 F.3d at 247.

Nor do KLEC's representative's answers to hypotheticals posed in interrogatories demonstrate vagueness here. *Id.* at 249–50.  "Hypotheticals are a favorite tool of those bringing vagueness challenges," as almost all statutes are "susceptible to clever hypotheticals testing its reach." *Id.* at 251.  The district court and the legislators seized on one exchange where KLEC's representative suggested that "a bottle of water" offered during a meeting to discuss a pending bill could be a "possible" thing of value that would violate the ban, and that the legislator could "call [him] and ask [him] if he should accept under the circumstances." R. 47-1, PageID 668–71.

Just as in *Platt*, "[s]pecific facts matter," and it would have been irresponsible of the representative to respond definitively. *See* 894 F.3d at 248. Though a bottle of water does not immediately come to mind when one reads the catch-all provision (and the rest of § 6.611(2)(a)-(b)), it could possibly fall under the provision based on the surrounding circumstances. Responding, then, as here, that the situation would be evaluated on a case-by-case basis by looking at the surrounding circumstances shows prudence, not vagueness. *See id.* at 251.

The legislators offered another example to show vagueness. An employer of a lobbyist invited Senator Schickel to tour a factory, but he "declined due to a legitimate fear that being lent a hard hat to tour the facility, being subjected to heat for the building, or stopping to use the restroom facilities in the factory during the tour could run afoul" of this rule. Appellee Br. at 44. But this is a specious argument considering the detailed lists including, § 6.611(2)(a), and excluding, § 6.611(2)(b), items from "anything of value." The catch-all provision's plain language and the means to resolve questions about its coverage, including advisory opinions, provide fair notice of the conduct it prohibits.

*Arbitrary Enforcement.* To determine whether a statute creates opportunities for arbitrary enforcement, we ask whether the catch-all provision "provide[s] explicit standards guiding [its] enforcement." *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 359 (6th Cir. 1998). Just as in challenges to similarly-worded gift bans on lobbyists and others, we hold that explicit standards guide the enforcement of this provision. *See Fla. Ass'n*, 525 F.3d at 1075 n.1 (upholding lobbyist gift ban that defined "expenditure" as "a payment, distribution, loan, advance, reimbursement, deposit, or anything of value made by a lobbyist or principal for the purpose of lobbying"); *Kimbell*, 665 A.2d at 82 n.1 ("anything else of value"); *see also Yamada v. Snipes*, 786 F.3d 1182, 1188–89 (9th Cir. 2015) (rejecting vagueness challenge to "expenditure" definition that included "anything of value"); *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 130 (2d Cir. 2014) (same). In fact, the statutes in *Florida Association* and *Kimbell* provided far fewer examples of what the term "expenditure" did and did not include—nothing close to the twenty-five-plus subparts here. *See* Fla. Stat. Ann. §§ 11.045(1)(c), 112.3215(1)(d); Vt. Stat. Ann. tit. 2, § 261(5).

We find the catch-all provision not void for vagueness.

**G. Overbreadth and Chilling Effect**

"A law is overbroad under the First Amendment if it 'reaches a substantial number of impermissible applications' relative to the law's legitimate sweep." *East Brooks Books, Inc. v. Shelby Cty.*, 588 F.3d 360, 366 (6th Cir. 2009) (citation omitted). A plaintiff making an overbroad challenge may not "leverag[e] a few alleged unconstitutional applications of the statute into a ruling invalidating the law in all of its applications." *Speet v. Schuette*, 726 F.3d 867, 878 (6th Cir. 2013) (quoting *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 340 (6th Cir. 2009) (en banc)). Rather, a plaintiff "must demonstrate from the text of the statute and from actual fact that a substantial number of instances exist in which the law cannot be applied constitutionally." *Id.*

Much of our analysis here overlaps with our vagueness analysis. In finding the law overbroad, the district court once again relied on the same hypotheticals discussed previously. But, again, this provision does not sweep so broadly. As before, plaintiffs provide no evidence of any person who has ever been charged with violating this provision for (i) receiving a bottle of water; (ii) walking into a heated or cooled room; or even (iii) using the restroom in a lobbyist's office. Indeed, KLEC has never interpreted these "gifts" as "[some]thing of value" to be "reported, limited, or prohibited." In the unlikely event that KLEC ever charges anyone for (or threatens enforcement of) such conduct, an as-applied challenge would be appropriate.

We agree with the Commonwealth's argument that "[t]he gift ban . . . prevent[s] lobbyists from paying for one-on-one or small group interactions with legislators, to avoid the reality or appearance that important state legislation is being bought and sold in private." Appellant Br. at 31–32. Even in First Amendment cases, facial invalidation is "strong medicine that is not to be casually employed." *Connection Distrib.*, 557 F.3d at 336 (quoting *United States v. Williams*, 553 U.S. 285, 293 (2008)). Given the plainly legitimate sweep of these provisions to sports tickets, cars, wine, vacations, and art, the gift ban is not overbroad.

**V. CONCLUSION**

Kentucky's legislature acted to protect itself and its citizens from the damaging effects of corruption. Because these laws are closely drawn to further Kentucky's anticorruption interest, they pass constitutional muster. Accordingly, we AFFIRM the court's judgment upholding the constitutionality of § 6.767(3), and the dismissal of § 121.150(13) on standing grounds. We VACATE the district court's judgment as to § 6.811(4), § 6.811(5), § 6.811(6), and § 6.811(7), and REMAND with instructions to dismiss those claims for lack of subject-matter jurisdiction. We REVERSE the court's judgment as to § 6.751(2) and § 6.767(2), VACATE the permanent injunction in its entirety, and REMAND for further proceedings consistent with this opinion.