RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0178p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee*,

    *v*.

DALE C. EMMONS (20-5869); GERALD G. LUNDERGAN (20-5890),

                *Defendants-Appellants*.

> Nos. 20-5869/5890

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:18-cr-00106—Gregory F. Van Tatenhove, District Judge.

Argued:  April 29, 2021

Decided and Filed:  August 9, 2021

Before:  COLE, CLAY, and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Matthew M. Collette, MASSEY & GAIL LLP, Washington, D.C., for Appellant in 20-5869.  Kannon K. Shanmugam, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Washington, D.C., for Appellant in 20-5890.  Robert J. Heberle, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Matthew M. Collette, Kathryn A. Robinette, MASSEY & GAIL LLP, Washington, D.C., Leonard A. Gail, MASSEY & GAIL LLP, Chicago, Illinois, for Appellant in 20-5869.  Kannon K. Shanmugam, Aimee W. Brown, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Washington, D.C., Shon Hopwood, Kyle Singhal, HOPWOOD & SINGHAL, PLLC, Washington, D.C., J. Guthrie True, TRUE GUARNIERI AYER, LLP, Frankfort, Kentucky, for Appellant in 20-5890.  Robert J. Heberle, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., Andrew T. Boone, Kate K. Smith, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

———————————

**OPINION**

———————————

CLAY, Circuit Judge.    Defendants Dale C. Emmons ("Emmons") and Gerald G. Lundergan ("Lundergan") appeal the district court's entry of judgment against them following a jury trial for alleged criminal activity related to Alison Lundergan Grimes' ("Grimes") campaign for the U.S. Senate seat held by Mitch McConnell in 2014.   Emmons and Lundergan were convicted by a jury for knowingly and willfully making unlawful corporate contributions aggregating $25,000 or more, under the Federal Election Campaign Act ("FECA"), 52 U.S.C. §§ 30109(d)(1)(A)(i), 30118, and 18 U.S.C. § 2; conspiracy to defraud the United States, under 18 U.S.C. § 371; willfully causing the submission of materially false statements, under 18 U.S.C. §§ 1001(a)(2) and 2; and the falsification of records or documents, under 18 U.S.C. §§ 1519 and 2. For the reasons stated below, we **AFFIRM** the district court's judgment.

**BACKGROUND**

Gerald Lundergan is the father of former Kentucky Secretary of State, Alison Lundergan Grimes, and he is the owner of S.R. Holding Company ("S.R. Holding"), which operates catering, events, and emergency disaster businesses.[1]   Lundergan has been actively engaged in Kentucky politics, having served as a member of the Kentucky House of Representatives and as the chair of the Kentucky Democratic Party.   On July 1, 2013, during her first term as Kentucky Secretary of State, Grimes announced her intention to run against Mitch McConnell in the 2014 U.S. Senate race.[2]   Jonathan Hurst ("Hurst") served as Grimes' campaign manager, but Lundergan was heavily involved in the day-to-day operations of the campaign—namely campaign fundraising, expenses, and strategy—and often met with Hurst to discuss these topics.

---

[1]Lundergan's daughters, Abby Lundergan Dobson and Alissa Lundergan, have taken on most of the responsibility of running the company.

[2]Up until she announced her candidacy, Grimes did not intend to run for McConnell's Senate seat and had even told her staff and supporters the morning of the announcement that she was not going to run.  As a result, her announcement took many by surprise, including her own family—some of whom were away on vacation at the time. As a result of Grimes' last-minute decision to run, the necessary infrastructure for her campaign was not in place beforehand, so Grimes' family stepped in to help with the campaign.

Lundergan negotiated with vendors, hired campaign staff, and reviewed and approved vendor invoices and campaign advertisements.

After Grimes announced her intention to run against McConnell, the campaign began planning a kick-off event to take place at the end of July 2013 that would serve as a more formal announcement of the campaign. The kick-off event took place at the Carrick House, which is owned by Lundergan. The Lundergan family, including Gerald Lundergan and Grimes' sisters, Abby Lundergan Dobson and Alissa Lundergan, helped coordinate the event, and S.R. Holding made payments to four vendors who provided staging, lighting, an LED video wall, and audio-visual equipment and services for the event, at a total cost of $25,495. S.R. Holding only invoiced the campaign $3,706.25—which covered the expenses that the company incurred for the stage, audio-visual services, tent stations, bottled water, two banners, chairs, and the outdoor facility rental—and the campaign paid this balance in a check addressed to "Lundy's Special Events."[3] (R. 211, Trial Tr. at PageID # 3814; Doc. No. 31, App'x at 144–45.) The campaign's FEC Report that was filed on October 15, 2013, included the $3,706.25 payment to S.R. Holding, and the report was sent to Grimes, Lundergan, and Hurst for their review to ensure that the listed disbursements were described accurately. After the company was served with a grand jury subpoena requesting records and information related to expenses incurred for the campaign, S.R. Holding invoiced the campaign for the unpaid expenses of the kick-off event.

Near the start of the campaign, Dale Emmons, a friend of the Lundergan family and a political consultant, and his associate Joey George began providing political consulting services to help Grimes' and other Kentucky Democrats' campaigns. Emmons wanted to be selected for the position of Kentucky Coordinated Campaign Director, so, as a means of demonstrating his capability for the role, Emmons and George began drafting a coordinated campaign plan for the Kentucky Democratic Party—working out of the basement of the same building where the Grimes campaign had its headquarters.[4] At this time, the coordinated campaign was not

---

[3]As discussed at trial, Abby Dobson Lundergan testified before the grand jury that she was the one who mistakenly underbilled the campaign for expenses incurred by S.R. Holding for the kick-off event.

[4]The coordinated campaign was a separate operation run by the Kentucky Democratic Party to support Democratic candidates throughout the state, with a particular focus on the candidate at the top of the ballot, which was Grimes during the 2014 election. In order to be selected for director of the coordinated campaign, Emmons

operational, and it did not come into existence under mid-2014. From July 2013 to November 2013, S.R. Holding paid a total of $90,500 to Emmons & Company for Emmons and George's work,[5] which were invoiced as "Consulting Services Retainer" until they both began directly working for the Grimes campaign in January 2014. (R. 274, Trial Tr. at PageID # 7463; R. 211, Trial Tr. at PageID # 3827–28; Doc. No. 33, App'x at 482.)

At trial, a major point of dispute between Defendants and the government was whether Emmons and George were working in anticipation of the coordinated campaign or were providing their services for the benefit of the Grimes campaign. For example, government witness, Agent Tylor Hanna, testified at trial that Emmons "did a variety of things for the Alison for Kentucky campaign, such as setting up robocalls, getting artwork for different marketing things, setting up fund-raiser events, accompanying the candidate to various events, organizing meetings, [and] communicating with the leadership of the Alison For Kentucky campaign." (R. 252, Trial Tr. at PageID # 6393–94.) Additionally, Hurst and Erin Tibe, the campaign's compliance director, testified that they did not know that S.R. Holding was paying Emmons and George for their work and thought they were working for the campaign in a volunteer capacity until January 2014. But, as demonstrated on cross-examination, Defendants asserted that Emmons and George were organizing events and preparing materials for events that promoted the plan they created for the coordinated campaign, part of which involved coordinating with Grimes' campaign given that she was the lead candidate on the ballot.

In addition to payments for consulting services, Lundergan used funds from S.R. Holding to reimburse Emmons for the expenses he paid to third-party vendors for mailers and robocalls promoting campaign-related events as well as for an internet upgrade for the office. At trial, Brian Chism, the owner of Chism Strategies, Inc., testified that the company recorded robocalls to promote the Alison For Kentucky campaign and encourage voters to attend campaign events. Emmons was the primary contact for Chism Strategies and provided the content for the calls and direction on which voters to contact, and Lundergan and Hurst were copied on the emails to

---

needed the support of Grimes, the Kentucky Democratic Party, and the Democratic Senatorial Campaign Committee. Grimes wanted Emmons to be selected as director, but members of the Kentucky Democratic Party did not want Emmons for the position. Accordingly, he was not given the role.

[5]From the S.R. Holding payments, Emmons paid George a monthly salary of $3,500 for his work.

Chism Strategies regarding the content and scheduling of the calls. Although the calls were authorized by the campaign, the calls erroneously stated that they had been "Paid for by Alison For Kentucky," (R. 261, Trial Tr. at PageID # 6922; R. 274, Trial Tr. at PageID # 7478), as Chism Strategies invoiced Emmons & Company for the expenses related to the call. (Doc. No. 31, App'x at 79–81 (invoice from and checks made out to Chism Strategies, Inc., for "Rec call" and "Setup").)

Additionally, Emmons was reimbursed by S.R. Holding for payments he made to Bluegrass Integrated Communications for mailers promoting campaign events. For example, Bluegrass invoiced Emmons & Company for invitations it made for the "Women Leading Lexington" event held in September 2013, which it listed as being work for "Alison For Kentucky." (R. 229, Trial Tr. at PageID # 5670; Doc. No. 31, App'x at 85–90.) The invitation contained the campaign logo and a disclaimer that erroneously indicated that it had been "paid for [by] Alison For Kentucky," as Emmons & Company paid $1,605.58 for the invitations and was then reimbursed by S.R. Holding. (R. 276, Trial Tr. at PageID # 7697–98.) Lundergan also reimbursed Emmons for an internet maintenance upgrade in his office in the basement of the Grimes campaign headquarters. Emmons paid Wendell Wilson Consulting, LLC, $2,850 for the upgrade, and was later reimbursed by S.R. Holding. And Emmons hired Wendell Wilson Consulting to troubleshoot the campaign network, which S.R. Holding similarly reimbursed. None of these payments by S.R. Holding were reported to the campaign.

Lundergan also paid third-party vendors, Financial Innovations and Axxis, Inc., for campaign merchandise. The Grimes campaign entered a licensing agreement with Financial Innovations, through which the company set up a website and sold merchandise and from which the campaign received no proceeds. The Grimes campaign bought yard signs, rally signs, and table tents from Financial Innovations, and the campaign purchased lapel pins, t-shirts, bumper stickers, signs, and buttons, for which Abby Lundergan Dobson was the primary contact. Although the Grimes campaign treasurer, at Grimes' direction, tried to have the campaign pay for this merchandise, S.R. Holding ultimately covered the payments due for the merchandise. Axxis, Inc., provided staging, lighting, and audio and visual services for two campaign rallies— one at the Kentucky International Convention Center and another on election night at Carrick

House.  The invoice for these services was billed to "Lundy's Special Events," and S.R. Holding paid the balance.  (Doc. No. 31, App'x at 201–06; R. 274, Trial Tr. at PageID # 7509–11.)  S.R. Holding did not seek reimbursement from the Grimes campaign, and the company did not report the Emmons & Company reimbursement payments or the third-party vendor payments to the campaign.

On August 31, 2018, Lundergan and Emmons were indicted by a grand jury on several criminal charges related to their conduct during the campaign.  Emmons was indicted on one count of knowingly and willfully making unlawful corporate contributions aggregating $25,000 or more, under 52 U.S.C. §§ 30109(d)(1)(A)(i), 30118, and 18 U.S.C. § 2; one count of conspiracy to defraud the United States, under 18 U.S.C. § 371; two counts of willfully causing the submission of materially false statements, under 18 U.S.C. §§ 1001(a)(2) and 2; and two counts of falsification of records or documents, under 18 U.S.C. §§ 1519 and 2.  Lundergan was indicted for one count of knowingly and willfully making unlawful corporate contributions aggregating $25,000 or more, under 52 U.S.C. §§ 30109(d)(1)(A)(i), 30118, and 18 U.S.C. § 2; one count of conspiracy to defraud the United States, under 18 U.S.C. § 371; four counts of willfully causing the submission of materially false statements, under 18 U.S.C. §§ 1001(a)(2) and 2; and four counts of falsification of records or documents, under 18 U.S.C. §§ 1519 and 2.

Lundergan filed six separate motions to dismiss the counts in the indictment, which Emmons joined.  As relevant to the present appeal, Lundergan and Emmons argued that: (1) prosecuting Lundergan and Emmons for contributions to Grimes' campaign from Lundergan's closely-held companies violated the First Amendment; (2) the indictment failed to sufficiently allege that the payments made by the Lundergan Companies to Emmons for political consulting and vendors were coordinated with the campaign, and, accordingly, those payments were not impermissible campaign contributions; and (3) FECA's corporate contributions ban violated the Equal Protection Clause and the First Amendment by prohibiting solely-owned corporations from making campaign contributions, while allowing LLCs and partnerships to do so, and by prohibiting speech based on the speaker being a corporation, respectively.

The district court denied all of the motions to dismiss the indictment.  The district court said that the indictment alleged facts pertaining to proscribed campaign contributions, and these

allegations coupled with the use of the relevant statutory language and the term "contributions" was sufficient to allege a FECA violation without any additional showing of coordination between the campaign and Lundergan and Emmons. The district court also found that the ban against corporate contributions applied to the Lundergan companies' payments to the Grimes campaign and did not violate the First Amendment, notwithstanding that the companies are solely owned by Lundergan, who is Grimes' father.

Prior to trial, Lundergan and Emmons moved to exclude evidence under Federal Rules of Evidence 404(b) and 403 regarding corporate expenditures made by Lundergan for mailers and robocalls related to Grimes' 2011 and 2015 campaigns for Kentucky Secretary of State that may have violated Kentucky campaign finance laws. Lundergan and Emmons argued that the evidence was inadmissible because it was not probative of a material issue and was being introduced to show Defendants' propensity to violate campaign finance laws, despite the transactions never being charged under Kentucky campaign finance laws. Lundergan and Emmons also contended that the evidence was not probative for a non-character purpose because the alleged conduct related to the 2011 and 2015 campaigns was not "substantially similar" to the conduct alleged in the present indictment. Additionally, Lundergan and Emmons argued that the probative value of the evidence was substantially outweighed by the danger of needlessly delaying trial to establish that the alleged violations of state campaign finance law occurred, and of confusing the issues and misleading the jury on the charges against Lundergan and Emmons, the conduct at issue, and the relevant law—none of which prejudice would be alleviated by a limiting instruction. Finally, they contended that the evidence was not admissible as "res gestae" evidence because the alleged transactions from the 2011 and 2015 campaigns were not "inextricably intertwined" with the acts charged in the indictment or needed to complete the story of the charged offenses.

Following this motion, the government filed its notice of intent to introduce evidence of the 2011 and 2015 campaign related transactions to show Defendants' intent, plan, preparation, knowledge, and absence of mistake regarding the charged corporate contributions made to benefit Grimes' 2014 U.S. Senate campaign, and as res gestae evidence due to its temporal

connection with the indicted conduct.**[6]**  Regarding the 2011 Grimes campaign for Kentucky Secretary of State, the government sought to introduce the following other-acts evidence: (1) two checks from October and November 2011 totaling close to $220,000 from GCL Properties, LLC, to pay Hurst for consulting services and campaign mailers on behalf of the campaign; (2) three checks from June through November 2011 totaling around $53,000 from GCL Properties, Inc., and S.R. Holding to Emmons, who had been working during that time on the Grimes campaign; and (3) testimony from Hurst regarding Lundergan's failure to receive reimbursement from the campaign after the 2011 race and Hurst advising Lundergan to seek reimbursement from the 2014 Senate campaign for any corporate payments Lundergan made for the campaign.  As for the 2015 campaign, the government wanted to offer the following evidence: (1) testimony from Hurst indicating that in October 2015 Lundergan left $20,000 in cash and several business checks at Hurst's home to reimburse expenses incurred for campaign mailings and (2) two checks from October and November 2015 totaling around $11,000 from S.R. Holding to Emmons, during which time he was providing services to the campaign.

The district court ultimately admitted the evidence.  The court determined that the evidence was admissible as res gestae evidence because the 2011 and 2015 Grimes campaigns for Kentucky Secretary of State occurred shortly before and after the 2014 Grimes campaign for U.S. Senate, the transactions involved several of the same actors, and there was a causal connection between the acts of making impermissible corporate campaign contributions. Additionally, the court determined that evidence of impermissible campaign contributions in the 2011 and 2015 campaigns was admissible under 404(b) as other acts evidence to show Lundergan's and Emmons' intent, knowledge, or absence of mistake in making the alleged impermissible corporate contributions in the present case.  The district court then found that the

---

**[6]**After the government gave its Rule 404(b) notice, Lundergan and Emmons filed a motion to supplement its motion to exclude evidence of other acts, arguing that the evidence should not be admitted because (1) the government had not demonstrated that the payments made to Emmons were related to Grimes' 2011 and 2015 campaigns; (2) the payments made by Lundergan's company, GCL Properties LLC, were not impermissible corporate contributions; (3) introducing evidence of payments made to Emmons and payments made by the LLC created a particular risk of unfair prejudice; and (4) the transactions related to the 2015 campaign were only relevant to show propensity to commit the alleged conduct because they occurred after the 2014 Grimes U.S. Senate campaign.

evidence was probative of intent, and any potential prejudice could be cured by a limiting instruction.

At trial, Defendants and the government provided competing instructions on the definitions of the terms "contribution" and "expenditure." (*See e.g.*, R. 306, Trial Tr. at PageID # 8786–8812; R. 307, Trial Tr. at PageID # 8967.) At trial, the district court instructed the jury that "[f]ederal law prohibits corporations from making campaign contributions to a federal candidate or federal campaign committee." (R. 298, Jury Instructions at PageID # 8677.) As relates to contributions, the instructions indicated that:

> The law treats direct contributions of money or things of value and contributions made by way of expenditures for the benefit of the campaign differently. Consequently, the term "contribution" includes any gift, subscription, loan, advance or deposit of money or anything of value made by any person for the purpose of influencing any election for federal office. The term "contribution" also includes the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose. Finally, the term "contribution" also includes any direct or indirect payment, distribution, deposit, or gift of money, or any services, or anything of value to any candidate or campaign committee in connection with any election to the Office of United States Senator.

(*Id.* at PageID # 8677–78.) The instructions also indicated that "[a] person may also make 'contributions' in the form of expenditures that are coordinated with the campaign," and "[f]or a coordinated expenditure to be a 'contribution,' the expenditure must be made in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, her authorized political committees, or their agents." (*Id.* at PageID # 8678.) The instructions proceeded to define an expenditure as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value made by any person for the purpose of influencing any election for federal office, as well as a written contract, promise, or agreement to make an expenditure." (*Id.*) Finally, the district court clarified in the instructions that "[a] corporation, on the other hand, if there is no coordination, can make unlimited independent expenditures. That is, it can make any purchase, payment, distribution, deposit, or gift of money or anything of value made by any person for the purpose of influencing any election for federal office without coordination." (*Id.*)

After a 21-day trial, the jury found Lundergan and Emmons guilty on all counts. After the verdict, Lundergan and Emmons filed a joint renewed motion for a judgment of acquittal or, in the alternative, a motion for a new trial.**7** Lundergan and Emmons argued that the district court should enter a judgment of acquittal because the evidence was insufficient to establish beyond a reasonable doubt that the charged transactions were contributions under FECA or that Defendants knowingly or willfully caused the campaign to fail to report contributions or tampered with the campaign-finance reports. In addition to the verdict being against the weight of the evidence, Defendants argued for a new trial because of the jury instructions on unlawful contributions that failed to properly distinguish between a contribution and an expenditure, limit the scope of what constitutes a contribution, or apprise the jury of the three-part test for "coordinated communications" that qualify as contributions. Defendants also argued for a new trial based on the court's erroneous admission of 404(b) evidence regarding Lundergan's and Emmons' actions during the 2011 and 2015 Grimes campaigns and the exclusion of evidence of an FBI email exchange casting doubt as to whether Lundergan had the requisite specific intent to commit the offenses for which he was charged.

The district court denied both the motion for judgment of acquittal and the motion for a new trial. The district court found that there was sufficient evidence to support their convictions for unlawful corporate contributions and for causing the campaign to omit contributions from, and tampering with, the Grimes 2014 campaign's financial reports. The district court also determined that the contribution instruction was not flawed, the 404(b) evidence was properly admitted to demonstrate lack of mistake and its prejudice did not substantially outweigh the probative value, and the FBI email evidence was properly excluded.

The Presentence Reports for Lundergan and Emmons recommended Guidelines ranges of 63 to 78 months and 41 to 51 months, respectively. At the sentencing hearing, the district court sentenced Lundergan to 21 months in prison, followed by two years of supervised release, and imposed a fine and special assessment of $151,000. As for Emmons, the district court varied downward and sentenced him to three years of probation, nine months of which he would be

---

**7**Defendants first moved for a judgment of acquittal at the close of the government's case-in-chief, and renewed the motion after all the evidence was presented at trial in accordance with Fed. R. Crim. P. 29(b).

required to reside in a halfway house, and imposed a fine and special assessment of $50,600. This timely appeal followed.

## DISCUSSION

### I. Constitutionality of the Ban on Corporate Contributions as Applied to Intrafamilial Contributions from a Closely Held, Family-Run Corporation

We review "challenges to the constitutionality of a statute *de novo*." *Tomaszczuk v. Whitaker*, 909 F.3d 159, 164 (6th Cir. 2018). On appeal, Lundergan and Emmons argue that the ban on corporate contributions is unconstitutional as applied to their prosecution for payments made by S.R. Holding to Emmons and third-party vendors. They contend that the government cannot show that the ban as applied to intrafamilial contributions from a closely-held, family-run corporation is closely drawn to a sufficiently important interest and does not unnecessarily abridge First Amendment rights.

#### A. FECA and Limits on Campaign Contributions

The Federal Election Campaign Act, passed by Congress in 1971, implemented limitations and penalties for campaign contributions and expenditures as well as created reporting requirements for campaign donations and spending. *See, e.g.*, 52 U.S.C. § 30101 *et seq*. As relevant to the present case, FECA states the following:

> It is unlawful . . . for any corporation whatever . . . to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to, Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices . . . .

*Id.* § 30118(a). The statute makes it a felony for an individual to "knowingly and willfully commit[] a violation of any provision of this Act which involves the making, receiving, or reporting of any contribution, donation, or expenditure . . . aggregating $25,000 or more during a calendar year." *Id.* § 30109(d)(1)(A)(i).

Since its passage, FECA has been the subject of significant litigation, especially given the First Amendment implications of restricting campaign contributions and expenditures.

*See Buckley v. Valeo*, 424 U.S. 1, 14 (1976) ("The Act's contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution."); *see also Citizens United v. FEC*, 558 U.S. 310, 342–43 (2010) ("The Court has recognized that First Amendment protection extends to corporations. . . . Corporations and other associations, like individuals, contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster." (internal quotation marks omitted)). As first addressed in *Buckley*, the Supreme Court has applied different levels of scrutiny to statutory limitations on campaign contributions as opposed to those on independent expenditures—upholding contribution limits if they are supported by "a sufficiently important interest" and if they "employ[] means closely drawn to avoid unnecessary abridgment of associational freedoms," 424 U.S. at 25, while subjecting limits on independent expenditures to "the exacting scrutiny applicable to limitations on core First Amendment rights of political expression,"[8] *id.* at 44–45.

Applying the "closely drawn" standard, the Supreme Court in *Buckley* determined that the FECA limit on contributions was constitutional based on the government's significant interest in "limit[ing] the actuality and appearance of corruption resulting from large individual financial contributions," finding that "the integrity of our system of representative democracy is undermined" where "large contributions are given to secure a political quid pro quo from current and potential office holders." *Id.* at 26–27. The Supreme Court also noted a significant interest in reducing the "appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions" because such appearance of corruption could erode confidence in the government. *Id.* at 27. It then found that $1,000 contribution limitation was "closely drawn" to the asserted interests because the limitation targeted the "problem of large campaign contributions," which is "the narrow aspect of

---

[8]The Supreme Court in *Buckley* reasoned that contribution limits only marginally restrict freedom of speech because while "[a] contribution serves as a general expression of support for the candidate and his views," it "does not communicate the underlying basis for the support," and "[t]he quantity of communication by the contributor does not increase perceptibly with the size of his contribution." 424 U.S. at 20–21. In contrast, "[a] restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* at 19 (footnote omitted).

political association where the actuality and potential for corruption have been identified," while still allowing individuals to engage in political expression and political association. *Id.* at 28.

Following *Buckley*, the Supreme Court has maintained "quid pro quo corruption" as the only legitimate interest that the government has in regulating individual campaign contributions. *McCutcheon v. FEC*, 572 U.S. 185, 192 (2014) ("Any regulation must instead target what we have called '*quid pro quo*' corruption or its appearance."). In *McCutcheon*, the plurality defined quid pro quo corruption as a "direct exchange of an official act for money" and indicated that "the Government may not seek to limit the appearance of mere influence or access" as a basis for regulating contributions. *Id.* at 192, 208. For purposes of the "closely drawn" standard, the government "must show only a cognizable *risk* of corruption—a *risk* of quid pro quo corruption or its appearance," and, although "[t]he threat of corruption must be more than mere conjecture, and cannot be illusory," the government "need not produce evidence of actual instances of corruption." *Schickel v. Dilger*, 925 F.3d 858, 870 (6th Cir. 2019) (internal quotation marks and citation omitted). And in the context of an as-applied challenge, the government must show that the application of the regulation to the contribution in question furthers an interest in preventing quid pro quo corruption. *See FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 464 (2007) (finding that, in the context of an as-applied challenge to a ban on corporate independent expenditures for "electioneering communications," the government needed to "prove that applying BCRA to WRTL's ads furthers a compelling interest and is narrowly tailored to achieve that interest").

## B. Intrafamilial Contributions

In the present case, Emmons and Lundergan contend that intrafamilial contributions—the term they use to describe the payments made by S.R. Holding to Emmons and third-party vendors that benefitted the Grimes campaign—do not present a risk of actual or apparent quid pro quo corruption because the risk of favorable treatment comes from the fact that the person is related to the candidate rather than the exchange of the contribution itself. In *Buckley*, the Supreme Court addressed intrafamilial contributions in its discussion on expenditure limits for

candidates from personal or familial funds.[9]   424 U.S. at 51–53.  After finding that the D.C. Circuit had erroneously interpreted the $1,000-per-candidate contribution limit as not applying to immediate family members of the candidate, the Supreme Court determined that this application of the contribution limit was constitutional.  *Id.* at 51 n.57, 53 n.59.  In a footnote, the Supreme Court reasoned that "[a]lthough the risk of improper influence is somewhat diminished in the case of large contributions from immediate family members, we cannot say that the danger is sufficiently reduced to bar Congress from subjecting family members to the same limitations as nonfamily contributors."  *Id.* at 53 n.59.

Lundergan and Emmons claim that this conclusion is not binding on this Court because the issue of intrafamilial contributions was not squarely before the Supreme Court in *Buckley*. While there was no as-applied challenge to the contribution limit based on intrafamilial contributions in *Buckley*, Defendants' argument ignores the fact that the Supreme Court did explicitly determine that the proper interpretation of the individual contribution limit included intrafamilial contributions—albeit in a footnote—in upholding the constitutionality of that provision.  *See* 424 U.S. at 51 n.57.  And Defendants provide no basis to disturb *Buckley*'s conclusion that intrafamilial contributions can be constitutionally regulated, save for the conclusory assertion that the risk of corruption comes from the familial relationship and not the contributions themselves.  Just because a family member can choose to contribute to a candidate based on the familial relationship does not mean that the family member could not also contribute to the candidate for the purpose of receiving a quid pro quo.  Defendants' citations to such prosecutions demonstrate the risk of quid pro quo corruption—or the appearance thereof, *Buckley*, 424 U.S. at 26–27—from intrafamilial contributions.[10]   *See* Information at ¶¶ 1–13,

---

[9]The Supreme Court struck down the limit on expenditures from a candidate's personal or familial funds because it did not serve the interest of preventing actual or apparent corruption, reasoning that "the core problem of avoiding undisclosed and undue influence on candidates from outside interests has lesser application when the monies involved come from the candidate himself or from his immediate family."  *Buckley*, 424 U.S. at 53–54.

[10]Lundergan erroneously contends that the government must "show[] some evidence of actual or apparent quid pro quo corruption" in order to "constitutionally regulate intrafamilial contributions."  (Lundergan Br. at 23.) As previously indicated, the government need only show a "cognizable *risk*" of quid pro quo corruption, rather than "evidence of actual instances of corruption."  *Schickel*, 925 F.3d at 870.  Additionally, in the same way that Defendants assume that intrafamilial contributions only present a risk of favorable treatment based on the familial relationship, this argument also seems to assume that intrafamilial contributions cannot involve any coordination between a campaign and the family member making the contribution.

*United States v. Bera*, No. 2:16-CR-0097 TLN, 2016 WL 4492413 (E.D. Cal. May 9, 2016) (alleging that Bera had directly and indirectly solicited his family to make contributions to his congressional campaign for which he would reimburse them with his personal funds); *United States v. Acevedo Vila*, 588 F. Supp. 2d 194, 199 (D.P.R. 2008) (denying Acevedo Vila's motion to dismiss counts 1-9 of the indictment, which included allegations that he "solicited members of [his] family . . . to serve as conduits for illegal campaign contributions"); Information at ¶¶ 20–23, *United States v. Foley*, No. 3:14CR65(WWE), 2014 WL 4686481 (D. Conn. Mar. 31, 2014) (alleging that Lisa Wilson-Foley, a congressional candidate, and her husband Brian Foley engaged in a scheme in which Foley made payments from his real estate and nursing home companies to two of Wilson-Foley's campaign staffers—under the pretext that they provided services to the companies—none of which were reported to the FEC).

The cases cited by the district court in the order denying the motion to dismiss—despite not dealing explicitly with a quid pro quo agreement between a family member and a candidate for an official act—similarly demonstrate the potential for corruption, even quid pro quo corruption or its appearance, with contributions from family members. For example, in *United States v. Reed*, Walter Reed, the district attorney for Louisiana's 22nd Judicial District, was charged with wire fraud and money laundering after making payments from his campaign funds to his son Steven Reed's companies in excess of the bar services they provided and convincing two other companies to pay his son $5,000 each from the amount Walter had paid them for services to the campaign—from which Steven paid down a loan on which Walter was the guarantor. 908 F.3d 102, 108 (5th Cir. 2018). In *Reed*, while the familial relationship contributed to Walter's motivation for committing the offenses, the illicit payments were also motivated by a desire that Steven would return the favor by paying down the loan for which Walter was legally liable as guarantor. *See id.* In *United States v. Skelos*, although the quid pro quo corruption was between Dean Skelos, the former majority leader of the New York Senate, and two corporations—for the benefit of his son Adam Skelos—Adam actively participated in furthering the scheme by threatening one of the companies that his father would not obtain a contract for the company if they did not pay Adam more money. 707 F. App'x 733, 739 (2d Cir. 2017); *see United States v. Skelos*, No. S1 15 Cr. 317 (KMW), 2016 WL 1532253, at *3 (S.D.N.Y. Apr. 14, 2016), *vacated by Skelos*, 707 F. App'x 733. The facts in both *Reed* and

*Skelos* are not a large departure from a factual scenario in which a family member contributed to a candidate for the purpose of the candidate engaging in a beneficial official act.

## C. Corporate Contributions

Lundergan's and Emmons' contention that the payments at issue present no risk of quid pro quo corruption fails to account for the key fact in the present case that the payments were made by Lundergan's corporation, S.R. Holding, rather than from Lundergan's personal funds. In the same way that intrafamilial contributions present a risk of quid pro quo corruption, contributions from a closely-held, family run corporation pose a risk of quid pro quo corruption through the use of campaign contributions to secure political benefits for the corporation, and a risk of circumvention of the individual contribution limits.

The Supreme Court has continued to uphold the federal ban on corporate contributions. *See FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 210 (1982); *FEC v. Beaumont*, 539 U.S. 146, 152 (2003). In *National Right to Work Committee*, the Supreme Court first upheld the constitutionality of the ban on corporate contributions, finding it permissible for "Congress [to have] aimed a part of its regulatory scheme at corporations" for the purpose of "prevent[ing] both actual and apparent corruption." 459 U.S. at 209–10. The Supreme Court also refused to "second guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." *Id.* at 210. In *Beaumont*, the Supreme Court reaffirmed the constitutionality of the corporate contributions ban, noting that "[a]ny attack on the federal prohibition of direct corporate political contributions goes against the current of a century of congressional efforts to curb corporations' potentially 'deleterious influences on federal elections.'" 539 U.S. at 152 (quoting *United States v. Automobile Workers*, 352 U.S. 567, 585 (1957)). The Supreme Court also reaffirmed the original justifications of the ban "to prevent corruption or the appearance of corruption" by "barring corporate earnings from conversion into political war chests" and to "hedge[] against their use as conduits for circumvention of valid contribution limits."[11] *Id.* at 154–55 (internal quotation marks and editorial marks omitted).

---

[11]The Supreme Court later rejected the other two rationales used to justify the ban on corporate contributions—the "anti-distortion" principle and the shareholder-protection principle—in *Citizens United* in the

Lundergan and Emmons contend that the payments by S.R. Holding at issue in the present case should not be viewed any differently from other intrafamilial contributions simply because they were made by a corporation, given that Lundergan owns the corporations and is simply exercising his First Amendment rights using the corporate form. It is true "that speech that otherwise would be within the protection of the First Amendment [does not] lose[] that protection simply because its source is a corporation," *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784 (1978), and that "the First Amendment does not allow political speech restrictions based on a speaker's corporate identity," *Citizens United*, 558 U.S. at 347. However, given that intrafamilial contributions can be constitutionally restricted, there is no concern regarding speech discrimination based on the "speaker's corporate identity," and no basis to treat these contributions any differently from other corporate contributions, or contributions generally for that matter.[12]

Ultimately, the ban on corporate contributions is not unconstitutional as applied to intrafamilial contributions from a closely-held, family run corporation. As discussed, these contributions present a risk of quid pro quo corruption, and the Supreme Court has upheld limits on contributions from a candidate's family members as well as the ban on corporate contributions as being closely drawn to serve the interest in preventing quid pro quo corruption.

---

context of analyzing FECA's ban on independent expenditures. 558 U.S. at 349, 361–62. It is unclear if this holding applies in the context of corporate contributions, but in *McCutcheon* the Supreme Court only considered the interest in preventing quid pro quo corruption in determining whether to uphold the aggregate limits on individual contributions. *See McCutcheon*, 572 U.S. at 207–08, 211.

[12]Because the limit on contributions as applied to intrafamilial contributions from a closely-held corporation is constitutional, we need not address whether Lundergan's and Emmons' convictions for conspiracy and reporting violations are constitutional, on which Lundergan and Emmons only provide a brief mention on appeal. Additionally, FECA's reporting requirements do not rely on the constitutional status of the payments at issue, as the Supreme Court has upheld disclosure and reporting requirements even where it has struck down limitations on the payments being reported. *See Buckley*, 424 U.S. at 75–76 (finding that the disclosure requirement for independent expenditures served the "independent functions" of "insur[ing] that the voters are fully informed" and of "achiev[ing] through publicity the maximum deterrence to corruption and undue influence possible"); *Citizens United*, 558 U.S. at 369 ("The Court has explained that disclosure is a less restrictive alternative to more comprehensive regulations of speech.").

**II.  Adequacy of the Jury Instructions in Informing the Jury of the Distinction between Illegal Contributions and Constitutionally Protected Independent Expenditures**

"We review challenges to jury instructions under the abuse-of-discretion standard." *United States v. Williams*, 612 F.3d 500, 506 (6th Cir. 2010).  *But see United States v. Blanchard*, 618 F.3d 562, 571 (6th Cir. 2010) ("We review the legal accuracy of jury instructions de novo.").  In reviewing jury instructions, we look at "the instructions as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision." *United States v. Frederick*, 406 F.3d 754, 761 (6th Cir. 2005).  Reversal based on "an improper jury instruction" is only appropriate "if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *United States v. Kuehne*, 547 F.3d 667, 679 (6th Cir. 2008) (quoting *United States v. Harrod*, 168 F.3d 887, 892 (6th Cir. 1999)).

Emmons and Lundergan argue that the district court erred by failing to adequately distinguish between independent expenditures and contributions in the jury instructions.  FECA provides for similar definitions of contributions and expenditures, in part because, prior to the Supreme Court's decisions in *Buckley*, *Citizens United*, and the like, FECA regulated both independent expenditures and contributions alike.  For example, under the statute, contributions include "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office" as well as "the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose."  52 U.S.C. § 30101(8)(A). The statute then defines expenditures as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office," as well as "a written contract, promise, or agreement to make an expenditure." *Id.* § 30101(9)(A).  The jury instruction at issue included both of these definitions to explain what kinds of transactions constitute contributions and expenditures.

Subsequent case law has distinguished between constitutionally protected independent expenditures and campaign contributions that can be lawfully regulated based on the greater potential for quid pro quo corruption with contributions than with independent expenditures.

*See Citizens United*, 558 U.S. at 345 (noting that the Supreme Court in *Buckley* explained that the limit of independent expenditures did not serve an interest in preventing actual or apparent corruption because "[t]he absence of prearrangement and coordination . . . alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate" (alterations in original)).  In *Buckley*, the Supreme Court interpreted the $1,000 statutory limit on expenditures as "apply[ing] only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office," before deeming this limitation unconstitutional. 424 U.S. at 44 (footnote omitted).  In *Citizens United*, the Supreme Court defined independent expenditures as "political speech presented to the electorate that is not coordinated with a candidate," and then proceeded to determine that FECA's ban on corporate independent expenditures was unconstitutional.  558 U.S. at 360, 365. And in both cases the Supreme Court emphasized that contributions are those payments or items of value given to a candidate or campaign.  *See Buckley*, 424 U.S. at 24 (noting that the $1,000 limit on contributions applies when "the contribution is given to the candidate, to a committee authorized in writing by the candidate to accept contributions on his behalf, or indirectly via earmarked gifts passed through an intermediary to the candidate"); *Citizens United*, 558 U.S. at 345 (noting that *Buckley* upheld "FECA's limits on direct contributions to candidates").

In light of the statutory language and the relevant case law, Lundergan and Emmons contend that the district court's instruction on unlawful corporate contributions was confusing, misleading, and prejudicial because it presented the concepts of contributions and expenditures together by stating that "[t]he law treats direct contributions of money or things of value and contributions made by way of expenditures for the benefit of the campaign differently."  (R. 298, Jury Instructions at PageID # 8677.)  They also argue that the district court impermissibly "str[ung] together a series of overlapping statutory definitions that obscured the scope of a prohibited contribution," which are those contributions made to a candidate or campaign. (Lundergan Br. at 36–37.)  Without properly distinguishing between contributions made to a candidate or campaign and expenditures made independently, Defendants claim that the jury could have interpreted the instructions to say that "'anything of value' expended by a corporation 'for the purpose of influencing any election for federal office' was *both* a contribution and an independent expenditure."  (*Id.* at 38.)

Defendants' arguments are not persuasive because they fail to take into account the number of ways in which the district court's instruction clarified the distinction between contributions and independent expenditures, especially taking the instructions as a whole. *See Frederick*, 406 F.3d at 761. The instructions began with the statement: "Federal law prohibits corporations from making campaign contributions to a federal candidate or federal campaign committee." (R. 298, Jury Instructions at PageID # 8677.) The instruction also listed as one of the elements the jury needed to find beyond a reasonable doubt to convict Lundergan and Emmons for unlawful campaign contributions that "the Defendant caused unlawful contributions to any federal candidate or federal campaign committee in connection with [a U.S. Senate election]." (*Id.*) From the outset of the instruction, the jury knew that it needed to find that the payments from S.R. Holding were made as contributions to the Grimes campaign.

The instruction's statement that "[t]he law treats direct contributions of money or things of value and contributions made by way of expenditures for the benefit of the campaign differently" on its own could have caused confusion given that the phrase "contributions made by way of expenditure" includes the use of two concepts that the relevant case law has distinguished significantly. (*Id.*) But the instruction clarified this statement a few paragraphs later in which it explained that "[a] person may also make 'contributions' in the form of expenditures that are *coordinated* with the campaign" and indicated that a coordinated expenditure constitutes a contribution where it is "made in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, her authorized political committees, or their agents." (*Id.* at PageID # 8678 (emphasis added).) This instruction is in line with Supreme Court precedent holding that a coordinated expenditure can be regulated as a contribution and FECA's language on coordinated expenditures. *See Buckley*, 424 U.S. at 46–47 (footnote omitted) ("Yet such controlled or coordinated expenditures are treated as contributions rather than expenditures under the Act. Section 608(b)'s contribution ceilings rather than [§] 608(e)(1)'s independent expenditure limitation prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions."); 52 U.S.C. § 30116(7)(B)(i) ("[E]xpenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate[.]").

As for the use of the statutory definitions of "contribution" and "expenditure," these definitions do have overlap in terms of the types of transactions that are considered contributions and expenditures as well as the purpose of those transactions, namely to "influence[] any election for federal office." (R. 298, Jury Instructions at PageID # 4677–78.) But the key difference between contributions and independent expenditures is that contributions must be made to a candidate or campaign, whereas independent expenditures are those payments made independently from the campaign, without coordination. *See Buckley*, 424 U.S. at 24, 47; *Citizens United*, 558 U.S. at 360. The instruction made this key distinction and again clarified that a "corporation, on the other hand, if there is no coordination, can make unlimited independent expenditures. That is, it can make any purchase, payment, distribution, deposit, or gift of money or anything of value made by any person for the purpose of influencing any election for federal office without coordination." (R. 298, Jury Instructions at PageID # 8678.) And no reasonable jury would have concluded that these *lawful* independent expenditures fall within the scope of "*unlawful* corporate contributions." (*Id.* at PageID # 8677 (emphasis added).) Taken as a whole, the instruction on unlawful corporate contributions correctly stated the law as to the distinction between contributions and independent expenditures and was not confusing, misleading, or prejudicial in informing the jury that only corporate contributions and coordinated expenditures were proscribed under the law.

### III.   Admission of Evidence of Lundergan's Other Acts Under Federal Rules of Evidence 404(b) and 403

"We generally review the district court's admission or exclusion of evidence for abuse of discretion." *United States v. Bell*, 516 F.3d 432, 440 (6th Cir. 2008). But for evidence admitted under Rule 404(b), we use three different standards of review: (1) "for clear error the district court's determination that the 'other act' took place;" (2) "de novo [for] the district court's legal determination that the evidence was admissible for a proper purpose;" and (3) "for an abuse of discretion the district court's determination that the probative value of the other-acts evidence is not substantially outweighed by its unfairly prejudicial effect." *United States v. Ayoub*, 498 F.3d 532, 547 (6th Cir. 2007).

Lundergan and Emmons contend that the district court erred by admitting evidence of Lundergan's uncharged acts in connection with Grimes' campaigns in 2011 and 2015 for Kentucky Secretary of State as res gestae evidence and under 404(b). They argue that the evidence was not admissible as res gestae evidence because it lacked a temporal proximity and causal connection to the charged conduct regarding the 2014 Grimes Senate campaign. Additionally, Defendants contend that the evidence was not admissible as evidence of "other acts" because it did not go to show their state of mind, intent, or modus operandi; and the "other-acts" evidence did not involve Emmons at all. Finally, they argue that the evidence's probative value was substantially outweighed by its prejudicial effect because the evidence was inflammatory and likely led the jury to impermissibly infer that because Lundergan had previously violated campaign-finance laws he also did so in the present case.

Under Federal Rule of Evidence 404(b)(1), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The purpose of Rule 404(b) is to prevent a jury from "convict[ing] a 'bad man' who deserves to be punished not because he is guilty of the crime charged but because of his prior or subsequent misdeeds" and from "infer[ing] that because the accused committed other crimes, he probably committed the crime charged." *United States v. Phillips*, 599 F.2d 134, 136 (6th Cir. 1979) (footnote omitted). We have recognized some exceptions to this rule: (1) evidence that provides background information for the charged conduct referred to as "res gestae" evidence and (2) evidence admissible under Federal Rule of Evidence 404(b)(2) to "prov[e] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000); Fed. R. Evid. 404(b)(2).

**A. Admissibility of 2011 and 2015 State Campaign Evidence Under Rule 404(b)**

We need not address whether the district court properly admitted the 2011 and 2015 campaign as "res gestae" evidence because, notwithstanding, the district court properly admitted the evidence under 404(b) to show intent.[13] Under Rule 404(b)(2), the government may

---

[13]The "res gestae" exception only applies "where the evidence 'consist[s] of those other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the

"introduce evidence of 'other crimes, wrongs, or acts' committed by the defendant so long as the evidence is not used merely to show propensity and if it 'bears upon a relevant issue in the case.'" *United States v. Clay*, 667 F.3d 689, 693–94 (6th Cir. 2012) (quoting *Hardy*, 228 F.3d at 750). Rule 404(b)(2) provides a "non-exhaustive" list of permissible uses of "other acts" evidence, which includes "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* at 694 (quoting Fed. R. Evid. 404(b)(2)). In determining whether to admit "other acts" evidence under 404(b), district court must consider (1) "whether there is sufficient evidence that the other act in question actually occurred;" (2) "whether the evidence of the other act is probative of a material issue other than character;" and (3) "whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect." *Adams*, 722 F.3d at 810.

Neither defendant contests the district court's finding that there was sufficient evidence that the other act in question actually occurred; instead, they argue that the evidence lacked any probative value of Emmons' and Lundergan's intent to cause unlawful corporate contributions. And "the government is not required to demonstrate that the other acts occurred by a preponderance of the evidence;" rather, the government must provide substantiation for that evidence. *Bell*, 516 F.3d at 441. In the present case, the government provided sufficient substantiation of this evidence by presenting Hurst's testimony at trial.

As for the evidence's probative value, "[e]vidence of other acts is probative of a material issue other than character if (1) the evidence is offered for an admissible purpose, (2) the purpose for which the evidence is offered is material or 'in issue,' and (3) the evidence is probative with regard to the purpose for which it is offered." *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002). In the instant case, the government asserted that the evidence went to show Defendants' intent, lack of mistake, or knowledge in committing unlawful corporate

---

story of the charged offense.'" *United States v. Brown*, 888 F.3d 829, 836 (6th Cir. 2018) (quoting *United States v. Olds*, 309 F. App'x. 967, 974 (6th Cir. 2009)). In the present case, evidence related to payments made by Lundergan's companies in the 2011 and 2015 state campaigns was likely not inextricably intertwined with, or necessary to complete the story of, allegations related to similar payments in the context of the separate, 2014 Senate campaign. *Cf. United States v. Adams*, 722 F.3d 788, 812 (6th Cir. 2013) (finding that evidence related to previous instances of vote buying and jury tampering was "a prelude to and 'complete[d] the story' of the charged conspiracy by showing how [the defendants] rose to become political bosses in Clay County, their knowledge of vote buying, and their personal relationship").

contributions.     Additionally, Defendants' intent, absence of mistake, and knowledge was material or at issue in the trial because the government needed to show that Emmons and Lundergan caused unlawful corporate contributions knowingly and willfully.  *See United States v. Hardy*, 643 F.3d 143, 151 (6th Cir. 2011) ("[W]here the crime charged is one requiring specific intent, the prosecutor may use 404(b) evidence to prove that the defendant acted with the specific intent notwithstanding any defense the defendant might raise." (internal citations and quotation marks omitted)); 52 U.S.C. § 30109(d)(1)(A)(i).

Lundergan argues that the evidence was not probative of intent as the contributions from the 2011 and 2015 state campaigns had no bearing on his state of mind at the time of the alleged 2014 Grimes corporate contributions.  Specifically, Lundergan argues that the evidence was not substantially similar to the charged conduct from the 2014 Grimes campaign—given that the failure to seek reimbursement from the campaign could have been attributed to mistake or misunderstanding of the law and much of the payments from 2011 and 2015 were made during a different election, some of which were from Lundergan's LLC, and involved different methods of payment.  We have previously determined that "[t]o determine if evidence of other acts is probative of intent, we look to whether the evidence relates to conduct that is 'substantially similar and reasonably near in time' to the specific intent offense at issue."  *Haywood*, 280 F.3d at 721 (quoting *United States v. Blankenship*, 775 F.2d 735, 739 (6th Cir. 1985)).  Additionally, "[e]vidence showing that a defendant formed a particular intent on a prior occasion may provide insight into his state of mind when he committed the charged offense," in particular where the evidence "shows that the defendant took similar actions in a similar situation."  *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018).  And we have clarified that when using 404(b) evidence to show specific intent "[i]t is not necessary . . . that the crimes be identical in every detail," *United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006) (alterations in original), but "the prior acts [should be] part of the same scheme or involve[] a similar *modus operandi* as the present offense," *United States v. Carter*, 779 F.3d 623, 627 (6th Cir. 2015) (first alteration in original).

In the instant case, the evidence was substantially similar and reasonably near in time because the contributions from 2011 and 2015 involve Lundergan making payments from one of

his companies to third-party vendors and Emmons for goods and services on behalf of Grimes' Kentucky Secretary of State campaigns. While some of the payments were made in cash rather than by check to "Lundy's Special Events," these payments were not reported to the campaign, and Defendants did not seek reimbursement from the campaign and used vague invoices to hide these payments. *See Perry*, 438 F.3d at 648 (finding that the 404(b) evidence presented at trial was admissible because "unlike two completely unrelated robberies, Perry entered both NCB and Bank One carrying a gun in a bookbag and seeking change for $50," which was sufficient to demonstrate that the robberies were substantially similar despite "certain distinctions between the two robberies"). And although some of the payments were made by LLCs, who between 2011 and 2015 could lawfully contribute to a campaign in Kentucky up to the statutory contribution limit,[14] the payments to the LLC exceeded the contribution limit and were part of a larger scheme to circumvent contribution limits and make payments for goods and services benefitting the Grimes campaign. *Cf. Carter*, 779 F.3d at 627 (finding that there was "no authority to support the proposition that the intent to distribute suboxone strips, an entirely different drug from methamphetamine, in an unrelated venture is probative of a specific intent to join a conspiracy to manufacture homemade methamphetamine"). And the uncharged conduct was reasonably near in time to the charged conduct in the present case given that the uncharged conduct from 2011 and 2015 occurred in the campaign immediately prior and subsequent to, respectively, the charged conduct from the 2014 U.S. Senate campaign. Accordingly, the evidence was relevant to show Lundergan's and Emmons' intent to cause unlawful corporate contributions in the present case, as well as to show knowledge of and lack of mistake regarding the illegal contributions.

Emmons individually argues that the evidence had no probative value specifically as to his intent to cause unlawful corporate contributions because much of the evidence did not involve him. However, seven of the payments referenced at trial from the 2011 campaign were made to Emmons himself. As for the remaining payments to Hurst and third-party vendors, it is generally true that "similar act evidence is relevant only if the jury can reasonably conclude that

---

[14]*See Protect My Check, Inc., v. Dilger*, 176 F. Supp. 3d 685, 686 (E.D. Ky. 2016) (involving a challenge to "Kentucky's campaign finance law," which "include[d] certain limitations on corporate contributions that do not similarly apply to contributions from unincorporated groups, including unions and LLC's").

the act occurred and that the defendant was the actor." *Huddleston v. United States*, 485 U.S. 681, 689 (1988). But Emmons and Lundergan were charged in a conspiracy to cause unlawful corporate contributions and were tried together; any potential prejudice was alleviated by the jury instruction regarding other acts, which specified that the evidence should only be considered as to the individual defendant who was alleged to have committed those acts.[15]

## B. Admissibility of the 2011 and 2015 State Campaign Evidence under Rule 403

Lundergan and Emmons also contend that, notwithstanding its relevance, the 2011 and 2015 state campaign evidence should have been excluded under Federal Rule of Evidence 403. Lundergan and Emmons argue that the probative value of the evidence from the 2011 and 2015 campaigns was substantially outweighed by the danger of unfair prejudice because of the inflammatory nature of some details regarding the evidence and the likelihood that the jury used the evidence for an impermissible propensity inference. They contend that any prejudice was not properly mitigated by the instruction on 404(b) evidence, given that it was a generic 404(b) instruction. And Emmons separately argues that the evidence was particularly prejudicial to him given that he was not involved in some of the uncharged conduct presented at trial.

As relevant to the analysis of other acts under Rule 404(b) and the balancing test under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. As the Supreme Court and this Court have noted, the "term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged," such as "generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the latter bad act now charged (or, worse, as calling for preventive conviction even if he should happen to be innocent momentarily)." *Bell*, 516 F.3d at

---

[15]The jury instruction on the evidence of other acts admitted under Rule 404(b) read as follows: "You have heard testimony that a Defendant committed crimes, acts, or wrongs other than the ones charged in the indictment. If you find the Defendant did those crimes, acts, or wrongs, you can consider the evidence only as it relates to the Government's claim on the Defendant's intent, preparation, plan, knowledge, and absence of mistake. You must not consider it for any other purpose." (R. 298, Jury Instructions at PageID # 8696.)

444–45 (quoting *Old Chief v. United States*, 519 U.S. 172, 180–81 (1997)). Additionally, "[a] limiting instruction will minimize to some degree the prejudicial nature of evidence of other criminal acts; it is not, however, a sure-fire panacea for the prejudice resulting from the needless admission of such evidence." *Haywood*, 280 F.3d at 724.

The potentially "inflammatory" evidence presented at trial included evidence regarding Lundergan leaving cash with Hurst as payment for services provided to the Grimes campaign, blank checks, and a check with "Boy Scouts" in the memo line. (R. 307, Trial Tr. at PageID # 9039–40.) Notwithstanding the incongruous "Boy Scouts" line, this evidence is similar to that used to prove the conduct charged in the indictment. (*See* Doc. No. 33, App'x at 482 (invoicing S.R. Holding for Emmons' work for the campaign as "[c]onsulting [s]ervices").) In the closing statement, the government provided the proper 404(b) context for the evidence, indicating that it went to show that Lundergan and Emmons intended to cause unlawful corporate contributions, knew the applicable campaign finance law, and did not make a mistake or misapprehend the law in failing to get reimbursed by the campaign. (*See* R. 308, Trial Tr. at PageID # 9240 ("Innocent mistakes do not happen over a four-year period repeatedly. But you heard evidence that in 2011, Jerry Lundergan used over $200,000 in company funds to pay Jonathan Hurst for a state campaign expense. And then he tried to do it again in 2015."); *id.* at PageID # 9241 ("If Jerry Lundergan and Dale Emmons facilitated corporate money to pay Senate campaign expenses 36 times . . . if they used business funds over the course of four years to pay state and federal campaign expenses, and Jerry Lundergan tried to pay for campaign expenses in cash, you can conclude that both of these defendants knew exactly what they were doing.").) Further, as the district court noted in its decision admitting the evidence under 404(b), knowledge and intent to cause unlawful corporate contributions was central to the charged offenses and the trial. And any prejudice was mitigated by the limiting instruction, which cautioned the jury not to use the evidence for an impermissible propensity purpose and to consider the evidence if they found that the defendant committed those acts and only as to that defendant's "intent, preparation, plan, knowledge, and absence of mistake," specifically alleviating any prejudice aimed at Emmons regarding the other-acts evidence that only involved Lundergan. (R. 298, Jury Instructions at PageID # 8696.) Ultimately, given the significant probative value of the 2011 and 2015

campaign evidence and the minimal danger of unfair prejudice to Defendants, the district court did not abuse its discretion in admitting the evidence after conducting a Rule 403 balancing test.

**IV.  Sufficiency of the Evidence Regarding Whether Emmons Knew or Intended That the Payments He Received from S.R. Holding Would Not Be Reimbursed by the Grimes Campaign**

We review "*de novo* the sufficiency of the evidence to sustain a conviction." *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009).  "In reviewing the sufficiency of the evidence, the relevant inquiry is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wallace*, 597 F.3d 794, 800 (6th Cir. 2010) (internal quotation marks and citation omitted).

Emmons argues individually on appeal that the government failed to establish at trial that he intended to facilitate unlawful corporate contributions to the Grimes campaign or to cause the campaign to submit false reports to the FEC.  He contends that the government introduced no evidence to show that he knew or intended that the payments made by S.R. Holding would not be reimbursed by the campaign or had any involvement in campaign-finance reports for the Grimes campaign.

Under Federal Rule of Criminal Procedure 29, notwithstanding the jury verdict, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  In reviewing the district court's decision to deny a motion for judgment on acquittal, we do not "reweigh the evidence, reevaluate the credibility of witnesses, or substitute [our] judgment for that of the jury." *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015) (alteration in original) (quoting *United States v. Eaton*, 784 F.3d 298, 304 (6th Cir. 2015)).  And, given that the district court must view the evidence in the light most favorable to the government, "a defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) (internal quotation marks and citations omitted).

As indicated in the order denying the motion for judgment of acquittal, the district court determined that *Bryan v. United States*, 524 U.S. 184 (1998), provided the applicable standard

for mens rea in the present case. *Bryan* indicated that "in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" 524 U.S. at 191–92 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)). And in the present case, this means that the government only needed to establish that Emmons acted with the knowledge that he was aware of the ban on corporate contributions and the FEC reporting requirements.

The government presented sufficient evidence for a rational juror to find that Emmons had the requisite intent to cause unlawful corporate contributions and the Grimes campaign to submit false campaign-finance reports. At trial, the government presented evidence that Emmons was aware of the corporate contributions ban and FEC reporting requirements based on his attendance at a campaign finance presentation and his receipt of the campaign handbook and an email from Tibe indicating that the campaign was not allowed to accept donations from corporations. Additionally, although Emmons was not involved in the campaign's filing of finance reports or its compliance with the law on campaign contributions and expenditures, the government provided evidence of Emmons' extensive involvement in Kentucky politics, from which the jury could have inferred that Emmons was aware of the relevant campaign finance law, including that S.R. Holding needed to be reimbursed for making payments to him on behalf of the campaign and the campaign needed to report these payments to the FEC.

In addition to evidence demonstrating that Emmons was aware of the relevant campaign finance law, the government also included evidence potentially showing that Emmons helped Lundergan to conceal the nature of the payments made to him by S.R. Holding, which also went to his intent to cause unlawful corporate contributions and to cause the campaign to submit false reports. In his invoices to S.R. Holding, he used vague descriptors such as "Marketing Expense," "Processing Expense," and "East Kentucky Project Expenses," to name a few, which the government argued was to conceal that Lundergan's company was paying Emmons for his work related to the campaign. (Doc. No. 31, App'x at 97, 103.) However, many third-party vendors' invoices to Emmons would note that the work was being done for the "Alison For Kentucky" campaign or make reference to Grimes. (*Id.* at 99, 102, 107.) And the fact that the campaign was informed about Emmons' projected salary in anticipation of his desired position

as Executive Director of the coordinated campaign, which never materialized, does not undercut his intent to help Lundergan hide the fact that the payments made to Emmons were impermissible corporate campaign contributions. Ultimately, the government presented sufficient evidence for a reasonable juror to infer beyond a reasonable doubt that Emmons knowingly caused unlawful corporate contributions to be made to the Grimes campaign and for the campaign to submit false reports to the FEC.

## CONCLUSION

For these reasons, we **AFFIRM** the district court's judgment.